**In re Robert E. PEERMAN, Debtor.**

**Bankruptcy No. 89–11301FM.**

United States Bankruptcy Court,
W.D. Texas,
Austin Division.

Dec. 22, 1989.

Joe Martinec, Martinec, Hargadon & Wise, Austin, Tex., for debtor.

Eric J. Taube, Liddell, Sapp, Zivley, Hill & LaBoon, Austin, Tex., for creditor.

## MEMORANDUM OPINION

FRANK R. MONROE, Bankruptcy Judge.

The Debtor filed a Motion For 506 Valuation (the "Motion") seeking valuation by this Court of certain real property that is property of the debtor-in-possession's estate under 11 U.S.C. § 541 for the purposes of the Debtor's Plan of Reorganization (the "Plan") and any motion to lift the stay which may be filed with regard to such property by Margaret K. Petmecky (the "Secured Creditor"). The Secured Creditor contested the Debtor's valuation and a hearing with some six hours of valuation testimony was had. The Secured Creditor stipulated that the purpose of the valuation is for the Plan and the Motion to Lift Stay (the "Stay Motion") which has since been filed by the Secured Creditor.

## FINDINGS OF FACT

1. Debtor filed this voluntary Chapter 11 on May 2, 1989.

2. At the time of the filing, Debtor owned approximately 120 acres of land in Hayes County, Texas, (the "Property") which can be divided into three main tracts for the purposes of valuation and which will be referred to throughout this Memorandum Opinion as follows:

A. *Fitzhugh Corners* —10 single family residential lots being a portion of the Fitzhugh Corners Subdivision (originally consisting of 23 lots, 13 of which have previously been sold) including one reserve lot and encompassing a total of 10.911 acres out of the Charles Wilcox Survey No. 36 and the John Barton Survey No. 80, Hayes County, Texas.

B. *Fitzhugh Place, Phase I* —24 single family residential lots being a portion of the Fitzhugh Place Subdivision, Phase I (out of a total of 25 lots, one having been previously sold), and encompassing a total of approximately 67.891 acres plus some minimal improvements situated on Lot 14, all being out of the John Barton Survey No. 80, Hayes County, Texas.

C. *Fitzhugh Place, Phase II* —2 large acreage tracts encompassing a total of 41.06 acres which have not been subdivided or improved.

3. Debtor purchased all of said property, including those lots which have since been sold out of Fitzhugh Corners and Fitzhugh Place, Phase I, in 1984 from the Secured Creditor at a price of $8,600.00 per acre for a total price of $995,000.00. The Secured Creditor retained a first lien on the property and it is stipulated and agreed to by the parties that such lien is, in fact, valid, perfected, and presently existing being legally owned by the Secured Creditor.

4. The Debtor subdivided Fitzhugh Place, Phase I, and Fitzhugh Corners; put in roads, fencing, one concrete dam on Lot 13 in Fitzhugh Place, Phase I, a guest house on Lot 14 in Fitzhugh Place, Phase I, six water wells; an entry gate; cleared Lots 13 and 14 in Fitzhugh Place, Phase I, and Fitzhugh Place, Phase II; and spent approximately $290,000.00 in doing so.

5. Debtor has paid to Secured Creditor in both principal and interest since the date of purchase $611,058.20.

6. The Debtor, one of the two most active developers in this area, testified that in his opinion the value of the property is as follows:

A. Fitzhugh Corners .............. $100,000.00 or $9,165.00 per acre;

B. Fitzhugh Place, Phase I ........ $560,170.00 or $8,250.00 per acre;

C. Fitzhugh Place, Phase II ....... $143,535.00 or $3,500.00 per acre

7. The expert witness for the Debtor, J. Scott McNabb of Texas Real Estate Counselors, Inc., fixed two values for each property, one being a retail value and the other being fair value, the fair value being determined through consideration of absorption rates for Fitzhugh Corners of 2¾ years, for Fitzhugh Place, Phase I of four years, and for Fitzhugh Place, Phase II of one year, a discount rate of 13% per year, and

projected realtor costs of sale of 4%. These values are as follows:

A. Fitzhugh Corners ........ $110,000.00 Retail Value
$ 84,000.00 Fair Value

B. Fitzhugh Place, Phase I .. $465,335.00 Retail Value
$335,000.00 Fair Value

C. Fitzhugh Place, Phase II $165,000.00 Retail Value
$165,000.00 Fair Value

8. Larry F. Roden of American Realty Analysts, the expert valuation witness for the Secured Creditor, likewise presented a value that would be analogous to the retail value as defined by Mr. McNabb and a fair value. The fair value was computed by taking the retail value and applying a nine year absorption rate in the case of Fitzhugh Place, Phase I, three years on Fitzhugh Corners, and one year on Fitzhugh Place, Phase II. In addition Mr. Roden deducted all current and future taxes, 10% sales commission, a discount rate of 13½%, and a 2% marketing fee. Mr. Roden's valuation numbers are as follows:

Fitzhugh Corners .......... $ 75,000.00 Retail Value
$ 45,000.00 Fair Value

Fitzhugh Place, Phase I .... $304,000.00 Retail Value
$105,000.00 Fair Value

Fitzhugh Place, Phase II ... $ 41,000.00 Retail Value
41,000.00 Fair Value

9. Real property taxes owing on all of the real property, which is the subject of the Debtor's Motion for the years 1988 and 1989 are in the approximate sum of $43,000.00.

10. Both appraisers agreed that the highest and best use for Fitzhugh Corners and Fitzhugh Place, Phase I, would be to market the single family lots. With regard to Fitzhugh Place, Phase II, the Secured Creditor's expert in his report found the highest and best use would be to hold the property for future development into a residential subdivision (i.e. hold as an investment). However, in contrast thereto, such expert testified that his opinion of fair value was based upon the sale of the property as is within a twelve-month period of time. Both the Debtor's and the Debtor's expert's opinions of value were made on this same latter assumption.

11. Secured Creditor, Margaret K. Petmecky, is aged and has in recent years been in a nursing home. At the present time, she is under the care of her son, Terry Petmecky, at home.

12. If and when the Secured Creditor receives the subject real property back, she would only be in a position to either sell the same or hold it for investment, both of which have been identified by her appraiser as the highest and best uses of the subject property.

13. Margaret Petmecky has remaining on hand from the funds which have previously been paid to her by the Debtor for the purchase of the subject real property, the sum of $180,000.00.

## ISSUES

1. What is the proper manner of valuing the real property in question which is to be returned to the Secured Creditor either under the Debtor's Plan or pursuant to an order lifting the stay; i.e. what is the appropriate method to use in determining the credit to be charged against the Secured Creditor's indebtedness by reason of such return?

2. What is the amount of that credit?

## DISCUSSION AND CONCLUSIONS

1. *Manner of Valuation.* Both parties rely upon the decision of the Fifth Circuit in *Sandy Ridge Development Corp. v. Louisiana National Bank, (In Re Sandy Ridge Development Corp.),* 881 F.2d 1346 (5th Cir.1989). It is clear under *Sandy Ridge* that a plan which provides for the return of collateral to the secured creditor for a corresponding credit against the indebtedness in an amount equal to the value of the collateral and the creation of an unsecured claim for any shortfall is confirmable over the objection of the secured creditor pursuant to 11 U.S.C. § 1129(b)(2)(A)(iii) as such will be the indubitable equivalent of the creditor's claim. *Sandy Ridge,* 881 F.2d at 1350. Additionally, here the parties have stipulated that the purpose of the Court's valuation is for determination of the proper credit upon the Secured Creditor's claim upon the return of its collateral either under a Plan or an order lifting the stay. At present, the pro-

posed Plan provides for a return of the collateral for appropriate credit and the Secured Creditor has filed a Motion to Lift the Stay which has not yet come on for hearing.

We are left then only to consider the proper method of valuation under 11 U.S.C. § 506. *Sandy Ridge* does not give us any guidance other than to authorize the Bankruptcy Court to set the value in accordance with Section 506(a). *Sandy Ridge,* 881 F.2d at 1354.

11 U.S.C. § 506(a) at relevant part states: "Such value shall be determined in light of the purposes of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest." 11 U.S.C. § 506(a).

One legal treatise states the following as to such section:

"Thus, the statute makes reasonably clear that any valuation of collateral is temporal, and must take into consideration both the reason the valuation is being made and the contemplated disposition or use of the collateral. However, virtually no attempt is made to set forth the manner in, or basis (except as dictated by identified factors) upon which, such valuation is to be conducted. These are left to judicial development."

*Collier on Bankruptcy,* paragraph 506.04 at pg. 506–25. The writer in *Collier's* shows a clear understanding of vagaries inherent in the valuation process. Specifically,

"... by reason of the case-by-case approach to valuation implicitly required by Section 506(a), the wide range of ways in which many items of property may be disposed of or used, and the inherent difficulty of determining the price that would be obtained in a hypothetical sale or other disposition of many, if not most, kinds of property that is not of a truly fungible nature, valuation should not be viewed as an exact science by any means."

*Collier on Bankruptcy,* paragraph 506.04 at pp. 506–25–6.

In the instant case, the real property is being returned to the Secured Creditor. The highest and best use for Fitzhugh Corners and Fitzhugh Place, Phase I is for the sale of the developed lots to end users. With regard to Fitzhugh Place, Phase II, the highest and best use is the retaining of ownership of the property as an investment for ultimate development into single family residential lots. The fact that the real property will be owned by the Secured Creditor, as opposed to this Debtor, or any other entity, does not alter the highest and best use of the property.

The Secured Creditor cites with great fervor the case of *In Re Raylin Development Co.,* 110 B.R. 259, 263 (1989) and decided by this Court's colleague, The Honorable Leif M. Clark, United States Bankruptcy Judge for the Western District of Texas. In *Raylin,* Judge Clark valued certain real property in the hands of Collecting Bank, N.A., which was created as an affiliate of First City Bank after it was sold to Robert Abboud to liquidate the weak assets of First City Bank prior to the FDIC-assisted "open-bank" takeover and sale to Mr. Abboud, on the basis that Collecting Bank should be forced to accept the collateral and give a corresponding credit to the bankruptcy estate roughly equal to what it would be able to receive through disposition of such collateral in the most commercially reasonable manner practical under the circumstances citing *In re American Kitchen Foods, Inc.,* 2 B.C.D. 715 (Bankr.D.Me.1976). Judge Clark further buttressed his result stating that, "Unsecured creditors have a right to expect, to count on, and the benefit from prudent disposition by under secured creditors of their collateral". *In Re Raylin Co.,* 110 B.R. 259 at 262.

In *Raylin,* Judge Clark found that the most commercially reasonable manner of disposing of the property for Collecting Bank would be for it to act as the developer of the property; accordingly, Judge Clark reasoned that the value thereof should be determined from the standpoint of an investor and, therefore, used "an investment value approach" (IVA) to deter-

mine value. Judge Clark stated with regard to the IVA approach that,

"It hypothesizes an *actual* economic use of the property, then searches for the value each of the respective parties could realistically expect to realize exploiting the hypothesized land use. It is easier to incorporate risk factors under this model evaluation, and so easier for the Court to do the job imposed by Section 506(a). At the same time, however, because IVA posits value from the point of view from the particular seller, it assumes that the creditor can make use of the land use proposal upon which it rests. Therefore, in order to apply the IVA valuation approach here described, we must first decide whether the proposed land use is indeed realistic and consistent with highest and best use of the property. We must then decide whether the means will yield the most net value. Finally, we must decide whether marketing this property in accordance with that proposed land use is a means of disposal of the proposal of the property reasonably available to the lender."

*Raylin Development Co.*, at 261.

Inherent in Judge Clark's analysis is the clear proposition that much like beauty is in the eye of the beholder, so value (of collateral) is in the hands of the holder. Presumably value could therefore differ depending solely upon whose hands are holding the collateral. Accordingly, a different value might well have been reached if the new First City, Texas, N.A. were the secured creditor as opposed to Collecting Bank, N.A. What about if the secured creditor was a widow, a real estate developer, a guardianship estate for a minor child, a doctor, a church, a blind man, a government agency, etc? The list is endless. Here the Secured Creditor argues that because she is aged and infirm the value of the Property is worth less in her hands because all she can do is sell it as soon as possible for whatever price it will bring. She, therefore, argues that the Court should place a liquidation value on the Property.

However, this Court feels (and interprets *Raylin* to mean) that § 506 requires the following inquiry in the following order:
1) What is the highest and best use of the collateral?
2) What use of the collateral will yield the highest net value?
3) Are 1) and 2) the same? (Presumably, these two will generally be the same.) Here they are by definition as the Secured Creditor's expert defined highest and best use as, "that reasonable and probable use that will support the highest present value, as defined as of the effective date of the appraisal." Petmecky Exhibit 12 at p. 16.
4) Is that use reasonably available to the lender?

In the instant case with regard to Fitzhugh Corners and Fitzhugh Place, Phase I, the sale of the already developed individual single family residential lots is what has been identified by the experts as the highest and best use of the property. This would be the case whether in the hands of the Debtor, the Secured Creditor, or any other party. Additionally, with regard to such property, that use (i.e. sale of the lots) will, by definition, yield the most net value, and marketing the property in that manner is clearly a means of disposal of the property reasonably available to this Secured Creditor. Therefore, since the use of professionals to consummate the sale of already developed residential real property lots in Fitzhugh Corners and Fitzhugh Place, Phase I, is something that is readily available to the Secured Creditor, whose affairs are presently being managed by her adult son, Terry Petmecky, the lots will be valued on that basis.

With regard to Fitzhugh Place, Phase II, the property can either be sold as is at present or held for investment purposes for ultimate development into single family residential lots. The latter was identified by the Secured Creditor's expert as being the highest and best use of the property. However, it is equally clear that such expert's opinion of value is not based upon that highest and best use but only upon the sale of the property as a single tract within

the next twelve months. Under the circumstances, both the sale of the property as a whole or the holding of such property as an investment for ultimate development into single family residential lots is a means of disposal reasonably available to this lender. The ultimate choice will lie with the Secured Creditor. However, the Secured Creditor makes that choice at her own risk when both are reasonably available, as

> "Courts are entitled to inquire after what method available to a given lender is *most* likely to yield the *most* value. It is important to highlight the two significant features of this inquiry: (1) The method must be reasonably available to the lender in question, and (2) The method which yields the *most net value* is the one desired by the Courts."

*See*, J. Queenan, *Valuation of Security Interests*, 92 Comm.L.J. 1923, (1987).

Here, the Secured Creditor argues that since she is aged and infirm and not in good health, the only possible way for her to deal with the property is to sell it as soon as she receives it back (the suggestion being that because she is aged and infirm, she is somehow only able to dump it on the market and will, therefore, obtain only whatever some charitable soul is willing to give to her out of the kindness of their heart). The Court, however, does not find this argument persuasive.

The retention of Fitzhugh Place, Phase II as an investment for future development requires no action whatsoever. The financial ability of the Secured Creditor to do so should not be in question since we know of at least $180,000.00 in cash in her possession which she will have in addition to the Property. Alternatively, if she chooses, she can sell Fitzhugh Place, Phase II as a whole thereby passing the investment opportunity on to someone else. Although this second alternative may result in the Secured Creditor realizing less today than she would receive in the future if the property was held for investment and ultimate development, that decision is hers. It does not affect the proper manner of valuation of the collateral for this Court to use in determining the proper credit on the Secured Creditor's claim in this proceeding. Valuation of Fitzhugh Place, Phase II in accordance with its highest and best use (holding as an investment for future development) is appropriate as it will yield the most net value and it is reasonably available to the lender in question.

2. *Determination of Value.*

A. *Fitzhugh Corners.* Due to the fact that both experts used more or less the same absorption period for the lots in Fitzhugh Corners, the amount of the discount from retail value to fair value does not vary significantly. The variance is in the initial finding of retail value.

The Court is not totally persuaded by the pessimism of the Secured Creditor's expert. Even though the subdivision has experienced a greater percentage of sales than Fitzhugh Place, the lots do appear to be less desirable in that they average just over one acre per lot and the land does not appear to possess the same intrinsic beauty as Fitzhugh Place, Phase II. However, the lots, being smaller, should command a higher per acre price. Considering all of the evidence, the Court feels that the present retail value is that which the Debtor testified to, or $100,000.00. Agreeing that the absorption period on Fitzhugh Corners may take as long as three years and that costs of sale could be as high as 8%, this Court determines present fair value to be credited against the Secured Creditor's indebtedness upon surrender of the property to be in the amount of $65,000.00.

*Fitzhugh Place, Phase I.* Here the experts disagreed to the greatest extent. This Court finds the analysis by the Debtor's expert to be the more reasonable. The appraisal issued by the expert for the Secured Creditor appeared to the Court to be an exercise in overkill. A nine year absorption period for the twenty-four lots in question appears excessive as compared to the four year absorption period used by the expert for the Debtor. Additionally, 10% commissions plus a 2% marketing fee is too high. The discount rates did not differ significantly. However, the Secured Creditor's expert's practice of placing value only

on the "usable" portions of the lots is highly questionable especially since his determinations of what was "usable" were clearly excessively harsh and, in this Court's opinion, bore no relation to the type of end user to whom these lots are likely to be sold. Examples are as follows:

1) Lot 1 contains 2.36 acres. However, only .56 acres was considered usable as the remainder of the lot was on the other side of a wet-weather creek which only has water in it when it rains a sufficient amount to cause the water to run. His $6,250.00 per acre valuation was multiplied only by the .56 acre usable portion resulting in a $3,500.00 present retail value; whereas, $6,250.00 per acre times 2.36 acres (the actual lot size) equals $14,750.00, which is a much more realistic estimate of current retail value as the existence of a relatively shallow and narrow wet-weather creek running through Lot 1 has little, if any, negative effect on its total value. Asthetically, it may well increase the value to the type of person that these lots will primarily interest. This applies as well to the other lots affected by this wet-weather creek.

2) Lot 6 contains 2.882 acres which a 60–foot wide Phillips Pipeline easement running across it. Clearly, the easement has some negative effect on value. However, the lot is clearly big enough to have more than one place upon which a home could be built and the entire amount of the easement is usable in the sense that the land is still there and can be enjoyed, it just cannot be built upon. The valuation placed on this lot was $5,500.00 or $1,908.00 per acre, whereas Lot 7 right next to it without an easement was valued at $6,000.00 per acre or $14,700.00. This Court finds that a 20% discount in per acre value to $4,800.00 per acre is a more realistic discount for the easement which would result in a lot price of approximately $13,800.00. This would also apply to the other three lots with easements across them.

3) Lot 11 is 6.066 acres in size and is a creek front lot on Barton Creek which extends to the other side of the creek; that is, frontage is on both sides of the creek. The Secured Creditor's appraiser deducted the land which is on the other side of the creek in order to determine the amount of usable land. This left 4.19 acres "usable" at $10,000.00 per acre for a lot price of $41,900.00. This deduction is totally without justification and the retail value of this lot should be determined by multiplying $10,000.00 per acre value times the full 6.066 acres for a retail value of $60,666.00. This appraiser seems to have given no credence to the fact that the type of purchaser who will most likely buy this type of property will find the total amount of the property "usable" because it is the total amount of the property which provides the aesthetic nature and quality of the property. In fact, frontage on both sides of the creek, so as to be able to control what is built just across the creek from you, may well enhance the overall per dollar acre value of the total lot. Accordingly, this type of willy-nilly reduction in "usable" acreage is totally discounted by this Court.

The Court has chosen to use the above three lots as illustrations of the manner in which the Secured Creditor's expert has artificially depressed the retail value of the lots in Fitzhugh Place, Phase I through his usage of his unduly restrictive and harsh definition with regard to what property is usable and what is not. Wherever it was used by this appraiser, the Court finds it was not justified and has not given any credence except with regard to the easement lots as noted above. Using this appraiser's per acreage valuations (with a 20% discount for the easement lots) the retail value of Fitzhugh Place, Phase I would be $465,000.00. This is still approximately $100,000.00 less than the Debtor's expert's opinion of retail value, and in the opinion of the Court still too low. This Court finds the retail value of the lots in Fitzhugh Place, Phase I to be $525,000.00.

There has existed over at least the past year a dispute with regard to whether or not the Secured Creditor had indicated to the Debtor that no partial releases would

be executed. The testimony of the Debtor is clear that no marketing effort has been made for at least the past year due to these representations made to him by the Debtor's son, Terry Petmecky. Terry Petmecky denies these allegations. Regardless of the reason, this Court finds that no marketing effort has been made over at least the past one year period of time with regard to these lots and, therefore, the historical absorption of these lots bears very little relation to, and will be of no assistance in determining, the future absorption of these lots. Aggressively marketed, they can certainly be sold in less than nine years and more probably, over a period of the next three to four years. This Court feels that with an appropriate discount applied during a three and one-half year absorption period assuming 8% costs of sale would result in a present fair value of $375,000.00, based upon a current retail value of $525,000.00.

*Fitzhugh Place, Phase II.* There is no evidence before the Court with regard to investment value of this tract. This is in spite of the fact that the Secured Creditor's expert stated that investment was the highest and best use for the Property at present. The Court cannot, therefore, value it on that basis. All of the valuations assumed a sale of the total amount of the tract within one year. Based upon the evidence heard and the testimony of the parties, this Court finds that such tract has both a present retail value and a present fair value when considered for sale as one tract, assuming a sale to take place within one year from this date, of $2,750.00 per acre or $112,915.00.

## RULING

Whether the subject real estate be returned to the Secured Creditor pursuant to the Debtor's Plan or pursuant to the pending Motion to Lift Stay filed by the Secured Creditor, credit shall be given to the Debtor to be applied against the claim of the Secured Creditor in the amount of $552,915.00, less outstanding real estate taxes for 1988 and 1989 in the approximate amount of $43,000.00, for a total net credit of $509,915.00.

The above Findings of Fact and Conclusions of Law have been made pursuant to Bankruptcy Rule 7052 and a separate Order of even date herewith will be entered pursuant hereto.