### In re EL PASO TRUCK CENTER, INC., Debtor.

**Bankruptcy No. 90–30881–C.**

United States Bankruptcy Court,
W.D. Texas,
El Paso Division.

June 21, 1991.

Donald S. Leslie, El Paso, Tex., trustee.

Hal F. Morris, El Paso, Tex., for creditor Mercedes Benz Corp.

Marjorie W. Georges, El Paso, Tex., for creditor Bank of Ysleta.

Gerald Keith, El Paso, Tex., for debtor.

## ORDER ON MOTION FOR VALUATION INCIDENT TO ABANDONMENT

LEIF M. CLARK, Bankruptcy Judge.

CAME ON for hearing and consideration the motion of Donald S. Leslie, Trustee for Valuation, incident to abandonment. By agreement, the parties submitted appraisals to the court for its review, waiving cross-examination, and briefed the issues prior to the final hearing on the motion.

### JURISDICTION

This court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(b), 157(b)(2), and 11 U.S.C. § 506(a). The matter is a core proceeding, and the court accordingly may enter a final order with respect thereto.

## BACKGROUND FACTS

This motion involves a 14 acre tract of real property on the east side of El Paso County, outside the El Paso city limits. The trustee obtained this property upon its voluntary turnover from an affiliate of the debtor, WST Joint Venture. The Bank of Ysleta has a first lien on the property and, by agreement of the parties, will foreclose on it after the trustee abandons the property to it. The Bank of Montwood has a second lien on the same property. The trustee seeks a valuation because Montwood also has a lien on most of the rest of the debtor's property (much of which has been liquidated by the trustee, who is currently holding the cash proceeds from the sales). Mercedes–Benz Credit also asserts a lien on some of the debtor's other assets, and is unsecured for the balance. The trustee wants to know whether the property has sufficient value to satisfy not only the Bank of Ysleta but also a portion of Montwood's total claim. Mercedes–Benz wants Montwood to look first to its second lien on this real property before pursuing the rest of its collateral, in effect seeking to invoke the marshalling doctrine against Montwood. Montwood, of course, resists this effort.

## ANALYSIS

### I. *Valuation*

■ Both appraisers essentially agree on the value of the property itself, as determined in accordance with standard appraisal methodology. The trustee's appraiser (a member of the appraisal institute), concludes that the property is worth $395,000. Montwood's appraiser says the property is worth $380,000. Both use market data to reach their conclusions, though the market data of Montwood's appraiser is both broader and more conclusive. While one might quibble with adjustments each has made to their comparables, the overall result confirms that both sets of adjustments are defensible. The court concludes that the subject property has a market value of $380,000.

This, however, is only the beginning of the valuation process. Section 506(a) in-structs courts to determine the value of a creditor's interest in property of the debtor "... in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest." 11 U.S.C. § 506(a); *In re Raylin Development Co.,* 110 B.R. 259, 260–61 (Bankr.W.D.Tex.1989). This court has previously ruled that the valuation should be approached from the point of view of what the collateral would be worth in the hands of the creditor under the circumstances, and that adjustments to market value to account for costs the lender will absorb as a result of getting the property back are appropriate when collateral is not to be retained by the estate. *Id.* at 261; *In re The Landing Associates, Ltd.,* 122 B.R. 288, 292 (Bankr.W.D.Tex.1990).

■ The court has to date not ruled in any published opinion on the so-called "fair value" appraisals being issued in response to banking regulations. *See* 12 C.F.R., Part 34, Banking Issuance 90–29 (Sept. 5, 1990). According to the directive of the banking regulation,

The appraisal should estimate a value which might reasonably be anticipated from a 6 to 12 month exposure to the market and based on a cash sale transaction with the buyer and seller acting prudently, knowledgeably, and under no necessity to buy or sell. Your appraisal should estimate the cash price that might be received upon exposure to the open market for a reasonable time, considering the property type and local market conditions. When a current sale is unlikely—i.e., when it is unlikely that the sale can be completed within 12 months—the appraisal must discount all cash flows generated by the property to obtain the estimate of fair value. These cash flows include, but are not limited to, those arising from ownership, development, operation and sale of the property. The discount applied shall reflect the appraiser's judgment of what a prudent, knowledgeable purchaser under no necessity to buy would be willing to pay to purchase the property in a current sale.

*Id.* Per instructions from the Bank of Ysleta, the appraiser upon which Mont-

wood relies used this definition of value in arriving at his ultimate opinion of value. Concluding that it would take two years at a minimum to sell the property, he applied a 10% discount factor and arrived at an ultimate opinion of value of $325,000.

This court can find no rational basis for superimposing this "fair value" on top of the market value opinions offered by appraisers who follow standard appraisal methodology. If anything, the definition of "fair value" contains within itself the seeds of its own undoing. An appraiser is first asked to follow a standard "willing buyer—willing seller" approach, and is then instructed to superimpose a 6 to 12 month holding period. Anytime the seller is given a deadline within which to sell a piece of property, that seller is no longer "willing." Thus the definition is internally inconsistent.

A "fair value" is also by definition a duress valuation. All that such a directive tells us is what "bottom fishers" are likely to pay for such a property. Invariably, such an approach to valuation does little more than magnify the current market's anomalies. As this court noted in *Raylin*, the same approach in a highly speculative market tends to *inflate* values. *In re Raylin Development Co.*, 110 B.R. at 260 n. 3. Given the importance of accurate valuation to the competing interests of both secured and unsecured creditors (and debtors too, for that matter), adopting such a valuation technique would be irresponsible. *Id.* at 261 n. 5.

There is another drawback to "fair value" as well. Appraisers are to "adjust" the market value for a holding period, discounting that number by a factor reflective of what a *purchaser* would be willing to pay currently. This directive of course exacerbates the duress feature of this approach to valuation, because now we must also presume that the *buyer* intends to itself *resell* the property. In other words, we are requiring the appraiser to assume that the buyer is a wholesaler, rather than an end user.[1] What is more, the discount factor applied does not reflect the *seller's* holding cost at all, even assuming that were an appropriate thing to do.

And it is not an appropriate thing to do. Appraisers uniformly maintain that the cost of holding a given piece of property is already built into the market value of a given piece of property. Thus, applying a discount factor, as the "fair value" approach instructs, in effect takes the same number out twice, skewing the value in the process.[2]

For all the foregoing reasons, the court rejects the use of "fair value" as a means of arriving at value for purposes of a Section 506(a) valuation.

▇▇▇ This is not to say that adjustments to market value are not appropriate, however, in a bankruptcy valuation. They are. For example, when property is given back to the lender, the lender will in turn have to incur the costs of disposing of the property, including brokerage fees. A standard brokerage fee of 6% can be anticipated. In addition, the lender will incur foreclosure costs for legal services, here estimated to be $2,000 (per the announcement of the parties).[3] These adjustments will be applied in this case to the market value, to arrive at a value for purposes of Section 506(a) of $355,200.[4]

1. In less polite terms, the regulation demands that the value reflect a sale to a speculator who intends to "flip" the property.

2. Applying the discount factor is especially distasteful when the property in question is not income-producing in the first place. The directive calls for the appraisal to discount back cash flows generated by the property, yet raw land by definition does not generate cash flow.

3. The court recognizes that the lender might not be the successful bidder at foreclosure, in which case the lender will not incur the brokerage fee. Usually, though, a third party will not appear at the foreclosure sale and the lender will then have to dispose of the property after foreclosure. For purposes of this motion, the court presumes that that is what will happen here.

4. It is important here to recognize that we are valuing the secured claim of Montwood, not the secured claim of the Bank of Ysleta. The latter claim is determined by adding to the principle claim whatever interest, attorneys' fees and other costs the bank is entitled to receive under Section 506(b). The brokerage fee which was *deducted* to arrive at the Section 506(a) value is not *added* to the Bank of Ysleta claim, because

## II. *Marshalling*

The trustee and Mercedes–Benz maintain that Montwood should be required to look first to its interest in this property before recovering any of its secured claim out of the balance of its collateral, relying on the marshalling doctrine. The court declines to invoke the doctrine in this case, for a number of reasons.

First of all, marshalling can be invoked only when the party seeking that relief files an adversary proceeding seeking such a remedy. Bankr.R. 7001. No such adversary has been filed in this case.

Second, marshalling is an equitable remedy in any event. The circumstances of this case militate against its application. This property is being abandoned to the Bank of Ysleta, which will in turn foreclose on it. Montwood can preserve its interest only if it first pays off that bank's first lien. It is inequitable to require Montwood to make a $305,000 investment (the approximate value of the Bank of Ysleta's first lien) to salvage collateral value of $44,600, especially when Montwood is far from assured of realizing that value.[5] *In re Century Brass Products, Inc.*, 95 B.R. 277, 279 (D.Conn.1989) (applying Connecticutt law). Observed the court in *Century Brass,*

> The doctrine of marshalling applies only to situations in which the creditor who would be compelled to avoid satisfying its debt from certain funds would not be prejudiced. At the very least, this rule requires that such a creditor not receive less if there is marshalling than if there is not.

*Id.* (citations omitted); *see also In re Del Grosso*, 106 B.R. 165, 169 (Bankr.N.D.Ill. 1989) (rejecting marshalling in the context of abandonment). The equitable marshalling doctrine should not be used to "put" property to a lender at a court-set value over its objection.

For these reasons, the court declines to foist marshalling on Montwood.

So ORDERED.

---

it would not in the usual instance be allowed under Section 506(b).

5. The trustee's appraisal stated that the highest and best use of the property was "speculative."