In re MONICA ROAD ASSOCIATES, Debtor.

FIRST AMERICAN BANK OF VIRGINIA, Plaintiff,

v.

MONICA ROAD ASSOCIATES, Defendant.

Bankruptcy No. 92–13700–AB.
Contested Matter No. 92–1438–AB.

United States Bankruptcy Court, E.D. Virginia, Alexandria Division.

Nov. 17, 1992.

---

Stephanie Wickouski, Reed Smith Shaw & McClay, Richard E. Lear, Hazel & Thomas, Washington, D.C., Sp. Counsel, for debtor.

Brian F. Kenney, Miles & Stockbridge, Fairfax, Va., for First American Bank.

## MEMORANDUM OPINION

MARTIN V.B. BOSTETTER, Jr., Chief Judge.

This matter is before the Court upon the motion of First American Bank of Virginia (the "Bank") seeking relief from the automatic stay pursuant to Section 362(d)(2) of the Bankruptcy Code. 11 U.S.C. § 362(d)(2). For the reasons stated herein, we hold that the Bank is entitled to relief from stay.

On October 31, 1988, Monica Road Associates, a single-asset Virginia general partnership (the "Debtor"), was formed for the purpose of purchasing and then developing, operating and leasing raw land consisting of approximately 12.4685 acres in the southwest quadrant of the Interstate 95 and Lorton Road interchange, identified as parcels 75A, 77, 80 and 81 in subdivision (1) on Tax Map 107–4 in the land records of Fairfax County, Virginia (the "Subject Property"). The Subject Property is zoned C–8, which means highway commercial, but

remains unimproved. Pursuant to a proffer, a portion of the Subject Property is required to be used for a motel.

On November 9, 1988, the Debtor purchased the Subject Property. The Bank provided the acquisition financing which is evidenced by a Deed of Trust Note dated November 9, 1988, made by the Debtor and payable to the order of the Bank on November 9, 1989 in the original principal amount of $2,325,000 (the "Note"). The Note is secured by a Deed of Trust giving the Bank a first lien on the Subject Property. The principal balance of the Note is currently $2,325,000.

In the fall of 1989, the Debtor negotiated an extension of the maturity date of the Note to August 1, 1990. On June 5, 1990 the Debtor and the Bank executed an Allonge and Modification of Deed of Trust Note (the "Allonge"), which was retroactively dated November 9, 1989. In late 1990, the Debtor sought from the Bank another extension of the maturity date of the Note without success. The Debtor did not pay the Note on August 1, 1990 and in June 1991, the Debtor discontinued making interest payments. On October 31, 1991, the Bank filed a Motion for Judgment in the Circuit Court of Fairfax County, Virginia seeking judgment against the Debtor and the Debtor's general partners on the Note and the Allonge.

On July 30, 1992, the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. The Debtor remains in possession of the Subject Property. With the exception of approximately $250 in a checking account, the Debtor's only asset is the Subject Property. In addition to the Bank's lien on the Subject Property, Adrian C. Hollands ("Hollands") is the holder of a note made by the Debtor in the principal amount of $100,000. Such note is secured by a deed of trust on a portion of the Subject Property, giving Hollands a second lien position on the Subject Property. Furthermore, the Subject Property is encumbered by a statutory lien for unpaid real estate taxes in the amount of $37,131.

On August 7, 1992, the Bank filed a motion for relief from stay under Section 362(d). Although the Bank originally sought relief from stay pursuant to both Sections 362(d)(1) and 362(d)(2), it appears that the Bank abandoned its argument under Section 362(d)(1) during the course of these proceedings. The Bank contends that the Debtor has no equity in the Subject Property and that it is not necessary for an effective reorganization. The Debtor opposes the Bank's motion.

On August 27, 1992, the Debtor and its general partners filed a joint plan of reorganization (the "Plan") and a disclosure statement. The Plan provides that the Debtor will convey the Subject Property to the Bank in full satisfaction of the Bank's claim. *See Debtor's Exhibit C–1 at 19.* In addition, the Plan states that pursuant to a settlement reached between Hollands and the Debtor, Hollands will release his second lien deed of trust on the Subject Property in exchange for a cash payment in the amount of $10,000. *Id.*

On January 28, 1992, the Bank sent to the Robert Paul Jones Company, Ltd., an MAI appraiser [Member, Appraisal Institute], a letter retaining such company to prepare and deliver a written appraisal of both the "market value" and the "fair value" of the Subject Property. *See Bank's Exhibit 10.* Such letter stated that "[t]he content of the report shall conform to the Uniform Standards of Professional Appraisal Practice as promulgated by the Appraisal Standards Board of the Appraisal Foundation." *Id.*

On March 31, 1991, the Robert Paul Jones Company, Ltd. delivered to the Bank a comprehensive report appraising the value of the Subject Property as of March 30, 1992 (the "Bank's Appraisal"). The Bank's Appraisal estimated both a market value and a fair value of the Subject Property. The Bank's Appraisal defined "fair value" as follows:

> The cash price that might reasonably be anticipated in a *current sale* under all conditions requisite to a fair sale. A fair sale means that buyer and seller are each acting prudently, knowingly, and under no necessity to buy or sell, i.e., *other than a forced or liquidation sale.* The

appraiser should estimate the cash price that might be received upon exposure to the open market for a reasonable time, considering the property type and local market conditions. When a current sale is unlikely, i.e., when it is unlikely that the sale can be completed within twelve months—the appraiser must discount all cash flows generated by the property to obtain the estimate of fair value. These cash flows include, but are not limited to, those arising from ownership, development, operating and sale of the property. The discount applied shall reflect the appraiser's judgment of what a prudent, knowledgeable purchaser under no necessity to buy would be willing to pay to purchase the property in a current sale.

*See Bank's Exhibit 10, citing* Department of the Treasury, Office of the Comptroller of the Currency, 12 CFR Part 7, Interpretive Rulings; "Other Real Estate Owned" *The Federal Register,* August 8, 1979, Volume 44, No. 154; p. 34696 (emphasis added).

The Bank's Appraisal defined "market value" as follows:

The most probable price which property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and acting in what they consider their own best interests; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U.S. dollars or in terms of financial arrangement comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

*See Bank's Exhibit 10 citing* Department of the Treasury, Office of the Comptroller

of the Currency, "Rules and Regulations" *The Federal Register,* August 24, 1990, Volume 55, No. 165; p. 34696.

On August 21, 1992, Thomas E. Reed ("Reed"), a licensed real estate broker, at the request of the Debtor delivered a comprehensive report appraising the value of the Subject Property as of August 14, 1992 (the "Debtor's Appraisal"). The Debtor's Appraisal presented only a market value of the Subject Property. Reed's definition of "market value" is consistent with the definition of "market value" used in the Bank's Appraisal.

Because the Subject Property is undeveloped, both the Bank's Appraisal and the Debtor's Appraisal used comparable sales of similar properties to arrive at their respective values. Both appraisals valued the Subject Property based on the "highest and best use" of the Subject Property. The Bank's Appraisal stated that the highest and best use is "retail pad sites," along Lorton Road, completed in stages so that the surrounding area could support such development. However, according to the Bank's Appraisal, the motel proffer applicable to the Subject Property would have to be removed before this use could occur. *See Bank's Exhibit 10.* Reed, on the other hand, stated that the highest and best use is for the development of a motel on the front 2.38 acres along Lorton Road in accordance with the proffer. Reed also stated that the remaining 10.09 acres would be best developed as a single site, such as a bowling alley, discount lumber yard or single retail use.

The Bank's Appraisal refers to, and includes a copy of, a "Sewer Feasibility Study" dated January 1992 and prepared by William H. Gordon Associates, Inc. (the "Sewer Report"). The Sewer Report discusses the availability and adequacy of the existing sanitary utilities for the development of the Subject Property. The Sewer Report concludes that sanitary sewer service is currently available for a portion of the Subject Property that drains north towards Lorton Road. The Sewer Report states that to provide sewer service to the remainder of the Subject Property would

cost $938,000 or $1,640,000, depending on the sewer system chosen. *See Bank's Exhibit 10, Appendix.*

In a letter accompanying the Bank's Appraisal, Robert Paul Jones ("Jones"), the president of the Bank's appraisal company, stated that "[s]ince the question of sanitary sewer is unresolved at the present time, we have decided to present two scenarios for valuing the subject site [under both the fair value and market value approaches]. Scenario 1 assumes that the entire subject site can be sewered by gravity flow from the existing sewer main in Lorton Road. Scenario 2 assumes that the rear two-thirds of the subject will have to be sewered using 'Alternative A' as presented in the [Sewer Report].... The cost of 'Alternative A' is estimated at $938,000. However, we have rounded this figure to $1,000,000 to allow for overhead and management." *See Bank's Exhibit 10.*

On October 21, 1992, this Court heard the Bank's motion for relief from stay. At such hearing, Jones testified that the market value of the Subject Property as of March 30, 1992 was $2,850,000 under Scenario 1 and $1,850,000 under Scenario 2. *Tr. at 96.* In addition, Jones testified that the fair value of the Subject Property was $1,847,000 under Scenario 1 and $1,175,000 under Scenario 2. *Tr. at 97 and 103.* Jones testified that it may be at least 30 months before there will be any demand for the Subject Property, given current market conditions. *Tr. at 98.*

Reed, on the other hand, testified that the market value of the Subject Property as of August 14, 1992 was $3,000,000. *Tr. at 195.* Reed did not give an appraisal of the fair value, and assumed that there was no sewer problem with the Subject Property. Reed testified that the sale of the Subject Property would take 12 months. *Tr. at 202.* Set forth below is a summary of the various values attributed to the Subject Property by the parties' respective appraisers:

| | |
|---|---|
| Debtor's Appraisal of Market Value: | $3,000,000 |
| Bank's Appraisal of Market Value–Scenario I: | 2,850,000 |
| Bank's Appraisal of Market Value–Scenario II: | 1,850,000 |
| Bank's Appraisal of Fair Value–Scenario I: | 1,847,000 |
| Bank's Appraisal of Fair Value–Scenario II: | 1,175,000 |

On November 4, 1992, this Court rendered an oral bench ruling that the Bank was entitled to relief from stay. This Memorandum Opinion supplements the findings and conclusions set forth in the record of November 4, 1992.

Section 362(d)(2) requires this Court to grant relief from stay only if we conclude that the Debtor has no equity in the Subject Property and that the Subject Property is not necessary for an effective reorganization. 11 U.S.C. § 362(d)(2)(A) & (B). In examining whether there is any equity in the Subject Property, we note that "the term 'equity' means the difference between the value of the property and encumbrances against it." *See Walter E. Heller Western, Inc. v. Faires (In re Faires),* 34 B.R. 549, 551 (Bankr.W.D. Wash.1983). Courts generally look to the valuation principles under Section 506(a) in determining the value of collateral for relief from stay purposes. *See Maitland v. Central Fidelity Bank (In re Maitland),* 61 B.R. 130, 134 (Bankr.E.D.Va.1986) (Shelly, J.) ("a creditor may obtain a valuation hearing under § 506(a) 'to obtain relief from the stay....' " *quoting* Butler, "Valuation of Secured Claims under 11 U.S.C. § 506(a)," 89 *Com.L.J.* 342, 345 (1984)).

Section 506(a) of the Bankruptcy Code provides that "[a]n allowed claim of a creditor secured by a lien on property in which the estate has an interest ... is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property.... Such value shall be determined *in light of the purposes of the valuation* and of *the proposed disposition*

*or use of such property....*" 11 U.S.C. § 506(a) (emphasis added).

Courts have wide latitude in determining value. According to the legislative history of Section 506(a) "value does not *necessarily* contemplate *forced sale or liquidation value* of the collateral; nor does it *always* imply a *full going concern value.* Courts will have to determine value on a *case-by-case basis,* taking into account the facts of each case and the competing interests in the case." *See Brown and Co. Securities Corp. v. Balbus* (*In re Balbus*), 933 F.2d 246, 249 (4th Cir.1991), *quoting* H.R.Rep. No. 595, 95th Cong., 1st Sess. 356 (1977), *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 6312 (emphasis added). Furthermore, the purpose of the valuation is significant: "While courts will have to determine value on a case-by-case basis, the subsection makes it clear that valuation is to be determined in light of the purpose of the valuation and the proposed disposition or use of the subject property." *Id., quoting* S.Rep. No. 989, 95th Cong., 1st Sess. 68, *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5854.

We note that the "purpose of the valuation" in the case at bar is to determine whether there is equity in the Subject Property for relief from stay purposes. With respect to the "proposed disposition or use" of the Subject Property, we note that the Debtor proposes in its Plan to dispose of the Subject Property by transferring it to the Bank in full satisfaction of the Bank's claim. *See Debtor's Exhibit C.*

Although the purpose of the valuation and the proposed disposition of the property are elements that provide guidance in an analysis involving valuation, we recognize that determining value is a difficult task. Judge Bonney stated that "[t]rue value is an elusive Pimpernel." *In re Jones,* 5 B.R. 736, 738 (Bankr.E.D.Va.1980). Valuation is not an exact science and has inherent vagaries. *See In re Peerman,* 109 B.R. 718, 721 (Bankr.W.D.Tex.1989), *citing* Collier on Bankruptcy, paragraph 506.04 at pp. 506–25–6. Courts have employed a wide variety of methodologies to determine value. *See, e.g., Peerman,* 109 B.R. at 723–25

(using "fair value" and rejecting "retail value"); *In re Simons,* 113 B.R. 942, 948 (Bankr.W.D.Tex.1990) ("liquidation value" is most appropriate where a reorganization plan proposes to return real property to secured creditor); *Robinson Ranch, Inc.,* 75 B.R. 606, 608–09 (Bankr.D.Mont.1987) (using "fair market value"); *In re Willis,* 115 B.R. 518, 520 (Bankr.D.S.C.1989) (using "wholesale value"); *In re Vitreous Steel Prods. Co.,* 911 F.2d 1223, 1232–33 (7th Cir.1990) (upholding the use of "liquidation value"); *In re Phoenix Steel Corp.,* 39 B.R. 218, 226–27 (D.Del.1984) (splitting the difference between "liquidation value" and "going concern value"). Notwithstanding the difficulties inherent in ascertaining value, this Court was presented with ample evidence by the parties to enable it to make such a determination.

■ The Bank bears the burden of proving that no equity exists in the Subject Property. *See* 11 U.S.C. § 362(g)(1). It presented the testimony of Jones who stated that he was very familiar with the Subject Property, having appraised the land a total of five times since October 1988. *Tr. at 122.* Jones stated that there are several factors that adversely affect the Subject Property. First, a proffer "restricted the use of the front portion of the property for motel use. It had always been our contention that the highest and best use, if it was unfettered, would have been for fast food restaurants, service station, other highway-related uses. With this proffered condition, that had a detrimental effect on the property, in our opinion." *Tr. at 88.* Second, there is "uncertainty on the sewer shed situation." *Id.* Jones testified that because of the development of a "secondary sewer shed" there is a risk that not all of the Subject Property could obtain sewer service through Lorton Road. *Id.* Third, Jones testified that "the most important thing that has happened over this time is the—you know, the obvious real estate depression that we are in, the extended marketing periods for virtually all commercial uses and the lack of demand for motel properties, which now, at least as of this date, a motel property is required on the front of this site. And it's our opinion that

there is just almost an absence of value or absence of demand for a hotel property." *Tr. at 89.*

Jones further testified that it may be at least 30 months before there will be any demand for the Subject Property, given current market conditions. *Tr. at 98.* In that regard, the market value approach does not take into account the costs associated with holding the Subject Property during the expected marketing period, such as real estate taxes. *Id.* Furthermore, the market value approach does not discount to present value the ultimate sale price of the Subject Property. *Id.* In defending his use of fair value, Jones testified that it is relevant under standard appraisal practice to make adjustments to the value of property for the period of time involving in selling it. *Tr. at 104.* The fair value appraisal method requires an appraiser to take into account the costs associated with holding a property more than 12 months before it is sold and discounting to present value the ultimate sales price. *See Bank's Exhibit 10* at 87–88.

After carefully reviewing all of the evidence presented on October 21, 1992, including the testimony of the two appraisers, we are most persuaded by Jones' testimony, supported by his appraisal, and conclude that the most appropriate appraisal method is the *fair value* method and find that the value of the Subject Property is $1,847.000.[1]

The Debtor objects to the use of a fair value appraisal of the Subject Property. Although the Debtor cites *In re El Paso Truck Center,* 129 B.R. 109 (Bankr. W.D.Tex.1991) (Clark, J.), for the proposition that the fair value approach to appraising the Subject Property is not appropriate, we disagree with that conclusion and the reasoning of that court. The *El Paso* court, in our view, wrongly concluded that a fair value appraisal imposes an artificial deadline on selling property and is by definition a duress valuation. *Id.* at 112. Under the fair value method, there is no re-

quirement to sell the property. Rather, such method instructs appraisers to take into account the costs associated with holding property more than 12 months before it is sold and discounting to present value the ultimate sales price. Furthermore, the *El Paso* court, we believe, incorrectly stated that "appraisers uniformly maintain that the cost of holding a given piece of property is already built into the market value" of that property. *Id.* Even Reed, the Debtor's expert appraiser, testified that he did not consider holding costs such as real estate taxes, in determining his market value. *Tr. at 202–203.*

We note that there is a split of authority in the bankruptcy courts within the Western District of Texas as to the use of fair value. Although the *El Paso* court rejected its use, the court in *In re Peerman,* 109 B.R. 718, 721 (Bankr.W.D.Tex.1989) (Monroe, J.), accepted a "fair value" approach that discounted to present value sales proceeds anticipated to be received in the future and specifically rejected a "retail value" approach.

We also note that the Bankruptcy Court for the Northern District of Georgia, in *In re Stockbridge Properties I, Ltd.,* 141 B.R. 469 (Bankr.N.D.Ga.1992), stated that it was following the *El Paso* holding that the most appropriate method of valuation was fair market value and not fair value. However, notwithstanding its dicta that it was rejecting the fair value approach and using fair market value, the *Stockbridge* court in fact used the methodology employed by Jones in his appraisal of fair value in the case at bar. In *Stockbridge,* the debtor owned several parcels of unimproved real estate. The debtor's appraiser testified as to the fair market value of such parcels. However, the debtor's appraiser estimated that it would take approximately one to two years to sell all of the parcels and therefore "discounted the fair market value to present value by deducting the costs associated with maintaining and marketing the outparcels for that period." *Id.* at 471.

---

1. Because the principal balance outstanding under the Debtor's Note held by the Bank is $2,325,000, we do not need to address the issue

of whether the value of the Subject Property should be adjusted downward to $1,175,000 as a result of the sewer problems.

The secured creditor's appraiser estimated that it would take approximately three years to sell the parcels. *Id.* The *Stockbridge* court was persuaded by the creditor's appraiser with respect to marketing time and further discounted the debtor's previously discounted appraisal to present value. *Id.* at 472–473. Hence, the *Stockbridge* court in essence adopted the same fair value approach utilized by the Bank's appraiser in the case at bar. *See* Jones' testimony, *Tr. at 98.*

Although the Debtor objected to the use of the fair value appraisal, it did not challenge the assumptions made by Jones in arriving at his fair value appraisal. Such assumptions included the amount of taxes and administrative fees that would be expected to accrue during the marketing period, and the discount rate used to determine the present value of the Subject Property.

The concept of fair value is not new in asset valuations, especially for accounting purposes. The term "fair value" appears in at least three statements by the Financial Accounting Standards Board ("FASB"): FASB Statement No. 13 *[Accounting for Leases, Effective January 1, 1977]*; FASB Statement No. 15 *[Accounting by Debtors and Creditors for Troubled Debt Restructuring, Effective December 31, 1977]*; and FASB Statement No. 67 *[Accounting for Costs and Initial Rental Operations of Real Estate Projects, Effective December 31, 1982]*. FASB Statement No. 15 states that:

> The fair value of the assets transferred is the amount that the debtor could reasonably expect to receive for them in a *current sale* between a willing buyer and a willing seller, that is, *other than in a forced or liquidation sale.* Fair value of assets shall be measured by their market value if an active market for them exists. If no active market exists for the assets transferred but exists for similar assets, the selling prices in that market may be helpful in estimating the fair value of the assets transferred. If no market price is available, a forecast of expected cash flows may aid in estimating the fair value of assets transferred, provided the expected cash flows are discounted at a rate commensurate with the risk involved.

FASB Statement No. 15 *[Accounting by Debtors and Creditors for Troubled Debt Restructuring, Effective December 31, 1977]* (emphasis added).

■ An important feature of the fair value approach is the requirement that expected cash flows be discounted to present value when a current sale (defined in the Bank's Appraisal as one occurring within 12 months) is not expected. It is elementary that a property that can be sold for $2,850,000 thirty months from now is not worth $2,850,000 today. Because of the time value of money, a reasonably prudent person would not pay more than the present value of anticipated cash flows discounted at a particular rate of return calculated in light of the risk involved. Market value does not require the discounting to present value. Because of this fact, the accounting literature requires entities to account for real estate in certain circumstances in a manner that may be more representative of actual value.

Although one of the Debtor's criticisms of the fair value approach is that it results in a "duress valuation," we note that the definition of "fair value" used in the Bank's Appraisal specifically excludes "a forced or liquidation sale" and that the Bank did not even argue that "liquidation value" was the most appropriate valuation method in the case at bar even though there is persuasive authority for the proposition that liquidation value may be appropriate in these circumstances. *See, e.g., In re Simons,* 113 B.R. 942, 948 (Bankr. W.D.Tex.1990), which stated that where a Chapter 11 plan proposes to return real property to a secured creditor, "[v]aluation in these circumstances should be approached conservatively" and that "liquidation value is the appropriate value to use in this case.").

■ Because the principal balance outstanding under the Debtor's Note held by the Bank is $2,325,000, we find that the Debtor has no equity in the Subject Property. We therefore do not need to address

the issue of whether the Bank's claim should include such things as attorneys' fees or late charges or whether the value of the Subject Property should be adjusted downward further as a result of the sewer problems.

■ Turning to the issue of whether the Subject Property is necessary for an effective reorganization, we first note that the Debtor bears the burden of proof on this question. *See* 11 U.S.C. § 362(g)(2). To successfully defend a request for relief from stay, "a debtor must prove that a reasonable likelihood exists that an effective reorganization can be achieved within a reasonable period of time." *Crestar Bank v. Triton/Richmond Assoc. Ltd. Partnership,* 103 B.R. 764, 767 (Bankr. E.D.Va.1989), *citing United Sav. Ass'n. v. Timbers of Inwood Forest Assocs.,* 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988).

The United States Court of Appeals for the Fifth Circuit stated in dicta that property is not necessary for an effective reorganization where the debtor's plan contemplates the liquidation of the debtor's properties. *See Matter of Sandy Ridge Development Corp.,* 881 F.2d 1346, 1354 (1989), footnote 19. The Fifth Circuit cited approvingly *In re 6200 Ridge, Inc.,* 69 B.R. 837, 844 (Bankr.E.D.Pa.1987), which stated that "where the debtor is a single asset corporation which is not conducting any business, there is no basis to conclude that property lacking equity has any value to the estate in a liquidating plan." The Plan proposed by the Debtor contemplates transferring the Subject Property to the Bank in full satisfaction of the indebtedness evidenced by the Note. Although the Debtor contends that its Plan should not be characterized as a liquidating plan, however it is characterized, the effect is the same: to transfer the Debtor's only asset out of the Debtor's estate.

The Bankruptcy Court for the Eastern District of Virginia, in *In re L & M Properties, Inc.,* 102 B.R. 481, 485 (1989) (Shelly, J.), stated that "[t]o determine that there can be an effective reorganization of the debtor's business, the debtor must per-

suade the Court that the operation of the business will generate sufficient income to pay debt service." In the case at bar, the Debtor is a single asset real estate partnership that owns nothing but undeveloped land that is generating expenses but no income. The Debtor does not conduct any business and is not proposing in its Plan to reorganize in a manner that will generate any income to pay debt service. We therefore conclude that the Subject Property is not necessary for an effective reorganization.

For the foregoing reasons, we hold that the Bank's motion for relief from stay is granted pursuant to Section 362(d)(2) of the Bankruptcy Code. An appropriate order will be entered.