**In re W.B. SIMONS, d/b/a Rolling "S" Ranch, and wife, Margie Lee Simons; a/k/a Margie C. Simons; a/k/a Margie Simons, Debtors.**

**Bankruptcy No. 89–10690FM.**

United States Bankruptcy Court,
W.D. Texas,
Austin Division.

April 30, 1990.

Harvey D. Caughey, Austin, Tex. for creditor.

Travis R. Phillips, Phillips, Neal & Wood, Austin, Tex. for debtor.

**944**

MEMORANDUM OPINION

FRANK R. MONROE, Bankruptcy Judge.

A contested hearing was held on April 5, 1990, concerning confirmation of the Debtors' Second Amended Plan of Reorganization (the "Plan"), and the Court, having considered the Plan, the Objection thereto filed by secured creditors Clayton D. Lester and J. Pauline Lester (the "Lesters"), the testimony and documentary evidence placed into the record at the hearing, the letter brief of counsel for the Lesters and its own independent legal research, confirms the Plan upon the following Findings of Fact and Conclusions of Law pursuant to Bankruptcy Rule 7052.

*Findings of Fact*

1. The Debtors filed this Chapter 11 proceeding on May 7, 1989.

2. The Debtors' Second Amended Disclosure Statement was approved by Order of this Court on March 1, 1990.

3. Of the seven impaired classes, three secured classes accepted the Plan (Bank One being classes 4.2 and 4.3 and FDIC being class 4.4), two secured classes failed to vote (classes 4.5 and 4.6), the unsecured class accepted the Plan (class 5), and the Lesters rejected (class 4.1).

4. The Lesters hold a claim which is secured by a first lien deed of trust on 690 acres of land in Burnet County, Texas. The present principal balance of that claim is $425,988.21. This property plus ten acres securing the claim of Bank One in class 4.2 constitutes a 700–acre ranch named the Rolling "S" Ranch upon which the Debtors intend to continue to live and raise livestock.

5. On September 6, 1989, an Agreed Order Lifting Stay was filed having been signed by the Honorable Leif M. Clark, United States Bankruptcy Judge then acting in this case. Such Order provided Court approval of an agreement between the Debtors and the Lesters pursuant to which the Debtors agreed to file a plan by a date certain containing the payment terms reflected in the Order. Those payment terms required annual payments of $79,287.19 beginning June 1, 1990, and continuing thereafter on each successive June 1 until paid in full (a ten-year payout at 10% interest).

6. The plan originally proposed by the Debtors was filed timely and incorporated the agreement of the parties as set forth in the Agreed Order Lifting Stay. However, the Debtors amended the plan twice; and in this present Plan (the Second Amended Plan), they did not incorporate their prior agreement with the Lesters. Instead, the Plan now before the Court calls for the return to the Lesters of 131 of the total of 690 acres, valuation of the 131 acres, crediting the value against the secured claim, paying the Lesters interest accrued from October 5, 1989, through the effective date of the Plan at 10% per annum to the Lesters (approximately $30,000.00), and paying the balance of the claim remaining after the credit for the returned 131 acres (secured by the remaining 559 acres) in ten equal annual installments with interest at 10% per annum commencing June 1, 1991.

7. Jack Friedman acting as nominee for certain partnerships on or about December 12, 1983, made and delivered to the Simons his one certain real estate lien note ("Note 1") in the original principal sum of $625,-718.66 secured by some 10.12 acres of land in Williamson County, Texas.

8. Friedman, on or about November 1, 1983, executed and delivered to the Simons his one certain real estate lien note ("Note 2") in the original principal sum of $581,-386.95 secured by approximately 7.8 acres in Williamson County, Texas.

9. Friedman, on November 1, 1983, executed and delivered to the Simons his one certain real estate lien note ("Note 3") in the original principal sum of $33,880.63 secured by 2.281 acres of land in Williamson County, Texas.

10. On June 10, 1988, Friedman conveyed the real estate secured in Notes 1, 2, and 3 to William B. Pohl, Trustee, for Tony Ltd. Both Tony Ltd.'s obligation to Friedman and Friedman's obligations to the Simons became in default. Friedman's obli-

gations to the Simons under Notes 1, 2, and 3 were restructured in 1989 in the same agreement as Tony Ltd.'s obligations to Friedman. Such restructure calls for Notes 1, 2, and 3 to accrue interest at the rate of 10% per annum and to pay interest at the rate of 2.88% per annum until June 1, 1994. The difference will be paid to the Simons out of profits (as defined in the restructure agreement) if and when the property securing Notes 1, 2, and 3 are sold. Additionally, Notes 1, 2, and 3 were modified so that a total cumulatively annual payment of $250,000.00 would be paid to the Simons each year beginning May 20, 1990, an initial $250,000.00 having been paid earlier.

11. This agreement was approved in this case and in Jack Friedman's Chapter 11 case in Los Angeles.

12. Notes 1, 2, and 3 have present principal balances of $602,524.76, $559,584.69, and $32,489.00, respectively.

13. Payments on Notes 1, 2, and 3 will total $1,250,000.00 through the 1994 payment.

14. Payments to all classes of creditors receiving cash payments under the Plan (Bank One, FDIC, the Lesters, and unsecured creditors) are to be made primarily from the proceeds of Notes 1, 2, and 3 as restructured.

15. Bank One's Class 4.3 Claim of $327,542.28 is secured by Note 2, the proceeds of which are its cash collateral. Total payments under the Plan of Bank One's Class 4.3 Claim with interest at 10% will be $413,320.11 (4 annual payments of $103,330.03).

16. FDIC's Class 4.4 Claim of $89,614.03 is secured by Note 1, the proceeds of which are its cash collateral. Total payments under the Plan of FDIC's Class 4.4 Claim with interest at 10% will be $113,082.44 (4 annual payments of $28,270.61).

17. Bank One's Class 4.2 Claim of $189,086.44, which is secured by the 10 acres and home out of the 700–acre Rolling "S" Ranch, will be paid $22,729.24 when the Plan becomes effective which is to be applied first to approximately one year's accrued interest and then to principal. The

balance thereafter of approximately $185,000.00 will be paid in ten yearly installments at 10% of approximately $30,108.75 to a total of $301,087.50.

18. The Lesters secured claim, after valuation of the 131–acre tract to be returned (as hereinafter discussed), is $355,248.21, payable in ten annual installments at 10% interest requiring yearly payments of $57,816.65 to the total of $578,166.50.

19. Notes 1, 2, and 3 will provide the Debtors with $1,250,000.00. The other sources for payment of the Lester claim and the Bank One Class 4.2 Claim are proceeds from the operation of the Rolling "S" Ranch (none were proven over and above living expenses), and liquidation of the Debtors' interest in Slaughter Lane Joint Venture.

20. The Slaughter Lane Joint Venture will be sold under the Plan and the Debtors' share of the proceeds used to pay creditors. However, the actual date the property of the joint venture, which is unencumbered by debt, will be sold and the ultimate amount to be received by the Debtors from such liquidation are today unknown. The amount to be received is found by this Court for the purposes of confirmation to be between $75,000.00 to $150,000.00. Further, the property will be sold sometime before the expiration of five years.

21. The collections from Notes 1, 2, and 3 and the potential recovery from Slaughter Lane Joint Venture could total as much as $1,400,000.00 without regard to potential interest earnings on the amount collected each year in excess of the payments required. This may be substantial especially in the year the Slaughter Lane Joint Venture is liquidated. Further, in each of the years 1–4 the excess from Notes 1, 2, and 3 will be approximately $30,000.00, and in year 5 the excess will be approximately $162,000.00.

22. The total amounts to be paid on the claims of Bank One, FDIC, and the Lesters under the Plan is $1,405,656.50.

23. The unsecured claims of non-insiders total only $2,225.00.

24. The disparity between sources and uses of funds is minimal without regard to the interest accrual on the excess of collections over Plan payments the first five years under the Plan.

### Issues

1. Is it fair and equitable to the Lesters under § 1129(b)(2)(A) for the Debtors to return only part of a secured creditor's collateral for credit on the debt and pay the balance over time?

2. What is the value of the 131 acres?

3. Have the Debtors proposed the Plan in good faith as required by § 1129(a)(3) since the treatment proposed therein for the Lesters is different than the treatment the Debtors agreed to put into the Plan for the Lesters in the Agreed Order Lifting Stay?

4. Is the Plan feasible?

### Discussion and Authorities

1. *Partial Surrender of Collateral.* *Sandy Ridge Development Corp.* stands for authority that all of a secured creditor's collateral can be returned to that secured creditor as the indubitable equivalent of that creditor's secured claim. *In re Sandy Ridge Development Corp.*, 881 F.2d 1346 (5th Cir.1989). In *Sandy Ridge,* however, the creditor in question was undersecured. Here the collateral has value in excess of the secured claim.

Apparently it is a question of first impression as to whether less than all of the collateral may be surrendered to the secured creditor as a credit upon and as cancellation of only a portion of the secured claim and the remainder paid over time? Is that treatment fair and equitable?

■ The concept of fair and equitable is codified at 11 U.S.C. § 1129(b)(2)(A). The subsections of that section provide certain minimal requirements that must be met in order for a plan to be fair and equitable with regard to a dissenting class of secured creditors. They are by no means exclusive. The Fifth Circuit has made this clear in *Sandy Ridge* wherein it stated,

"To begin with, simple technical compliance with the requirements of § 1129(b)(2) does not assure that the plan is fair and equitable. *Id.* Instead, this section merely sets minimal standards that a plan must meet and does not require that 'every plan not prohibited be approved'. *Id.*"

*Matter of Sandy Ridge Development Corp.,* 881 F.2d 1346, 1352 (5th Cir.1989), citing *In re D & F Construction, Inc.,* 865 F.2d 673, 675 (5th Cir.1989).

■ The minimal requirements of § 1129(b)(2) require that the secured claimant (i) must retain its lien(s) and get paid the full amount of its claim in deferred cash payments the present value of which payments must equal the value of the collateral it holds, (ii) must be paid from the sale of its collateral, or (iii) must realize the indubitable equivalent of its claim. There is no indication in the statute or the legislative history that the alternative minimal conditions contained in 11 U.S.C. §§ 1129(b)(2)(A)(i), (ii), (iii) are mutually exclusive; that is, that a plan proponent can only choose one of the alternatives with regard to each secured creditor in its plan. This Court sees no reason why any or all three alternatives could not be used with regard to the same secured claim depending upon the particular circumstances involved. For example, if a secured creditor held a lien on ten lots in a subdivision, it is possible that plan would be fair and equitable to that creditor if it provided for the sale of three lots with the proceeds being applied to the secured claim, the return of four lots with the value thereof being applied to the secured claim, and the retention of three lots with the remaining secured claim being paid over time such that the present value of the income stream equalled the value of the secured creditor's interest in the remaining lots.

■ Here, two of the alternative provisions have been used. First, § 1129(b)(2)(A)(iii) is utilized in order to return the 131 acres to the Lesters for a corresponding credit on the secured claim. Second, § 1129(b)(2)(A)(i) is used with regard to the property being retained. This

is not a per se violation of the fair and equitable rule as embodied in § 1129(b)(2) of the Bankruptcy Code.

■ So the question becomes, "Does the Plan itself, because of the specific treatment provided and the nature of the collateral, provide a treatment that is not in fact fair and equitable?" The 131 acres being transferred for credit on the debt is easily divisible either from the 700–acre Rolling "S" Ranch or the adjacent 250 acres presently owned by the Lesters. Originally, the Lesters owned the entire 950 acres. They sold the Debtors the 700 acres they now own and retained 250 acres for themselves. The 131 acres in question are located behind the Lesters' 250 acres and can be attached to and become a part of the Lesters property or can be sold separately. The Debtors amended their Plan at the confirmation hearing pursuant to § 1127 of the Code and with the permission of this Court to include a 50–foot access easement running across the land the Simons are retaining from the highway to the 131 acres. This keeps the 131 acres from being landlocked and gives it value. Further, it allows the 131 acres to be sold as a unit by itself. This takes care of the Lesters' concern that if the 131 acres was given back, all they would be able to do would be to sell the entirety of the tract (their 250 acres plus the returned 131 acres). The easement provided by the Simons provides the Lesters with the option of selling the 131 acres by itself.

There is no issue with regard to the payout of the remaining debt to the Lesters meeting the requirements of 11 U.S.C. § 1129(b)(2)(A)(i). The Court concludes that the Plan is fair and equitable to the Lesters.

■ 2. *Value.* Valuation in these circumstances should be approached conservatively for at least three reasons. First, the Plan shifts the burden of sale of the 131 acres from the Debtors to the secured creditor. By doing so, the Debtors have shifted the risk of loss, as well as the potential for gain, to the secured creditor. In this circumstance, the potential for loss is greater than the potential for gain due to

the nature of the property and the depressed nature of the existing market for the sale of this type of property in the area where the property is located. Second, the secured claimant will not be earning interest on this portion of the secured claim until such time as the property is sold and converted into cash. The secured claimant is, in effect, getting a partial payment in kind that must be turned to cash prior to receiving a return. This was not part of the original bargain. To adequately protect the Lesters' secured claim (which is oversecured) the valuation of the portion to be returned should be on a conservative basis. Third, valuation is not an exact science, and the chance for error always exists. A conservative approach should, therefore, be taken in order to protect the secured creditor in this regard.

What is the value of this piece of property? The secured creditor's 250–acres of land fronts on the highway. The 131 acres being returned is directly behind and contiguous to the 250 acres owned by the Lesters. The 131 acres has highway frontage in two possible ways: First, by being joined to the Lesters' 250 acres; and second, by itself with the 50–foot access easement added pursuant to the Debtors' trial amendment of the Plan at the hearing on confirmation. Such amendment also provided that a fence will be constructed between the 131–acre tract and the Debtors' property at the Debtors' sole cost and expense. Conveyance of the 131 acres without the easement and the fence would have resulted in a minimal credit against the secured claim. However, the addition of the easement and the fence gives the 131 acres intrinsic value without regard to the adjacent tracts.

■ This Court must value the 131 acres in accordance with 11 U.S.C. § 506, "in light of the purpose of the evaluation and of the proposed disposition or use of such property, ...". 11 U.S.C. § 506(a). Here, the disposition of the property is to give it back to the Lesters. Mr. Lester testified at the hearing on confirmation he would have no alternative but to sell the property; and if there were no access, he would have to

sell his 250 acres as well due to his own personal situation. Clearly, the latter result would not be fair and equitable. However, the existence of the easement avoids that particular result. Even so, it will still be necessary for the Lesters to sell the 131 acres. Accordingly, liquidation value is the appropriate value to use in this case.

■■■ The Debtors' expert valued the property at $890 per acre, such value being "to adjacent landowners" as opposed to being a liquidation value to the public at large. Further, the highest and best use of the property was found to be ranching even though the land will not carry enough cattle to generate enough money to service an indebtedness based on an $890 per acre value.

The Lesters' expert valued the property at $500 per acre finding the highest and best use as being recreational, i.e. for sale to an individual who could afford the tract for his own recreational benefit.

The only redeeming feature of the 131 acres is a 15–acre canyon which has the only fertile land in the entire tract. The canyon is also well suited to hunting. Other factors affecting value are that approximately 30 acres of the land are overgrown with cacti; approximately two-thirds of the land is extremely rocky; even with an easement, access to the highway is one and one-half miles away; and utilities are available within 300 yards of the site.

Taking all factors into account addressed by the expert witnesses, and with due regard to the purpose of the valuation and the intended disposition of the property, this Court finds the liquidation value of the property to be $600 per acre. Additionally, since the secured creditor can only liquidate it, 10% cost of sale should be deducted to cover realtor's fees, title policies, etc. The arithmetic on this works out to be a net value of $70,740.00 which shall be credited against the secured claim of the Lesters. After transfer, whether by Warranty Deed or foreclosure, of the 131 acres the principal amount of the Lesters' secured claim will be $355,248.21.

3. *Good Faith.* The Agreed Order Lifting Stay entered on September 6, 1989, provided court approval of an agreement between the Debtors and the Lesters pursuant to which the Debtors obligated themselves to file a plan containing the payment terms reflected in the Order. Those payment terms required annual payments of $79,287.19 beginning June 1, 1990, and continuing thereafter on each successive June 1 until paid in full (a 10–year payout at 10% interest). The initial plan incorporated those payment terms. This one does not. The changes effected by the current Plan extend by one year each installment called for under the Agreed Order and reduces each installment to the extent the secured claim is reduced by the value attributable to the 131 acres being returned.

Apparently it is a question of first impression as to whether or not the Debtors' proposal of a plan containing terms different than that previously agreed to by the Debtors and the Lesters is in bad faith and, therefore, the good faith requirement of 11 U.S.C. § 1129(a)(3) is not met in this case.

■■■ Good faith is primarily a question of fact. The Court must look to the totality of the circumstances to determine good faith, not just one of the circumstances. *In re Texas Extrusion Corp.*, 844 F.2d 1142, 1160 (5th Cir.) cert. den., —— U.S. ——, 109 S.Ct. 311, 102 L.Ed.2d 330 (1988); *In re Jasik*, 727 F.2d 1379, 1383 (5th Cir. 1984).

■■■ Here, the Debtors have one present primary source with which to fund the Plan, that being Notes 1, 2, and 3 with Notes 1 and 2 representing 99% of the total of the three. Notes 1 and 2 are collateral for Bank One and the FDIC. The proceeds thereof are, therefore, cash collateral of Bank One and FDIC.

The earlier drafts of the present Debtors' Plan incorporated the agreement with the Lesters as embodied in the Agreed Lift Stay Order; but, however, FDIC and Bank One voted against such plans and objected to them on the basis that the plans used their cash collateral in a manner to which they had not agreed, that the use of that cash collateral to pay the Lesters on the basis proposed left them insufficiently pro-

tected with regard to their claims, that they had first claim to the proceeds, and, therefore, the plans were not fair and equitable to them.

The Debtors then changed the plan in order to make peace with FDIC and Bank One. This of necessity required amendment to the treatment proposed to the Lesters because the money would simply not go far enough, fast enough, to pay FDIC and Bank One on a more accelerated basis than that first proposed and also pay the Lesters the full amount of their secured claim as originally agreed. Therefore, the present Plan was proposed which provides for a return and valuation of the 131 acres, credit against the debt of its value, and payment of the balance. The return of the 131 acres is essential to feasibility. Only with that can the sources of income under the Plan effectively pay the total remaining secured debt.

Under the circumstances of this particular case, the Court finds that the Plan was proposed in good faith. The fact that the Debtors are not living up to their agreement as embodied in the Agreed Lift Stay Order is not bad faith per se. The Debtors had a valid reason for changing the Plan. The treatment proposed is fair and equitable. This may not be the case in all situations where an agreement has been struck and then is subsequently breached. However, it is the case here.

So, what is the effect of the breach of the Agreed Lift Stay Order? Clearly, if the payment required thereunder is not made on June 1, 1990, and the Debtors do not have a confirmed Plan by that date, the stay will lift. However, since this Court will be entering an order confirming the Plan prior to the June 1, 1990 deadline in the Agreed Lift Stay Order, the order confirming the Plan supersedes and takes precedent over the prior Agreed Lift Stay Order. As of the date the order of confirmation is entered, the Agreed Lift Stay Order becomes of no further force or effect. A lift stay order by its own nature is temporal. Of necessity, it must be superseded by any order confirming a plan unless preserved therein. As

the document that determines the rights of the parties after confirmation, a plan is binding upon the debtor and all creditors under 11 U.S.C. § 1141(a); and it is the order confirming the plan that breathes life into the plan. Accordingly, so long as the Debtors comply with their Plan as confirmed, the Lesters are enjoined from exercising their state law rights regardless of the provisions of any previous lift stay order to the contrary.

4. *Feasibility.* The Plan is feasible. The numbers work. There is a reasonable probability that all creditors will be timely paid so long as Notes 1, 2, and 3 are timely paid by Friedman. The next payment is due on May 20, 1990. If made, the Debtors will be able to commence payments under the Plan. If not, the Plan cannot be consummated. This Court will retain jurisdiction at least until the scheduled May 20, 1991 payment on Notes 1, 2, and 3 has been made as a measure of protection to the Lesters and the other creditors.

Counsel for the Debtors is directed to prepare and submit an Order Confirming Debtors' Second Amended Plan of Reorganization.