**In re ARNOLD AND BAKER FARMS, Debtor.**

**UNITED STATES of America, on Behalf of the FARMERS HOME ADMINISTRATION, Appellant,**

**v.**

**ARNOLD AND BAKER FARMS and Western Cotton Services Corp., Appellees.**

**BAP No. AZ-93-1577-AsRMe. Bankruptcy No. 86-1195-PHX-RTB.**

United States Bankruptcy Appellate Panel of the Ninth Circuit.

Argued and Submitted March 23, 1994.

Decided Dec. 30, 1994.

Richard G. Patrick, Phoenix, AZ, for U.S.

Don A. Beskrone, Phoenix, AZ, for Arnold and Baker Farms.

Frederick K. Steiner, Jr., Phoenix, AZ, for Western Cotton Services Corp.

Before ASHLAND, RUSSELL and MEYERS, Bankruptcy Judges.

*AMENDED OPINION*

ASHLAND, Bankruptcy Judge:

The debtor's plan proposed a "dirt for debt" transfer to two lienholders encumbering the primary asset of the estate. The first position lienholder objected to the plan on the grounds that: (1) the plan erroneously estimated the value of the land to be exchanged; (2) the plan was not proposed in "good faith;" (3) the plan violated the "best interests of creditors" test; and (4) the plan was not "fair and equitable." The bankruptcy court confirmed the plan over the largest secured creditor's objections. We reverse

the bankruptcy court's order confirming the plan.

## STATEMENT OF FACTS

The debtor Arnold and Baker Farms is an Arizona general partnership. The partnership was formed in 1975 by Walter H. and Nancy E. Arnold, Maurice F. and Maurine H. Arnold, and Charles M. and Wanda J. Baker for the purpose of farming and the sale and lease of farmland. Arnold and Baker purchased 1120 acres from Philip and Dorothy Ladra in 1975 and an additional 320 acres in 1979. The Ladras were given a first deed of trust on the property. In 1977, the farm began to experience financial difficulties.

The Farmers Home Administration ("FmHA") and Western Cotton Services Corporation, a wholly owned subsidiary of the Anderson Clayton Company, financed certain crops for the years 1978 through 1981. Additionally, FmHA lent Arnold and Baker sufficient funds to make the annual payments on the installments due to the Ladras in the years 1979, 1980, and 1983. In return, FmHA held a second deed of trust on Arnold and Baker's real property, a perfected security interest in the farm equipment, and a first deed of trust on the Arnolds' personal residence. Western Cotton held a third deed of trust on Arnold and Baker's real property.

The Ladras ultimately instituted a judicial foreclosure proceeding against Arnold and Baker's real property. Subsequently, in April 1984, the Bakers individually filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. The Ladras obtained relief from the automatic stay and continued their judicial foreclosure proceedings. Arnold and Baker, the partnership, filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in April 1986.

In May 1986, the bankruptcy court approved the sale of two pieces of real property free and clear of liens: 360 acres of real property to Cardon Oil Company and 480 acres to the entity known as the Corks. From the net proceeds of the sale and the payment of annual installments, Arnold and Baker satisfied the secured claim of the Ladras in the amount of $1,650,000. FmHA thereafter held a first priority and Western Cotton held a second priority lien in the property.

Arnold and Baker subsequently formulated two plans based on the income generated from the Cardon and Cork sales which proposed to pay in full the allowed claims of all creditors. The first plan was withdrawn when the Corks defaulted on their note and the other, a revised plan, was withdrawn when Cardon Oil defaulted on its note. With respect to the Corks' default, Arnold and Baker negotiated a settlement pursuant to which the Corks tendered 360 acres to Arnold and Baker in lieu of foreclosure.[1] With respect to the Cardon default, Arnold and Baker ultimately purchased the 320 acre parcel at a nonjudicial foreclosure.[2]

In January 1991, Arnold and Baker filed a second amended plan and disclosure statement. The second amended plan proposed to pay FmHA's $3,837,618 note and Western Cotton's $565,044 note in full. The plan proposed to transfer a proportionate fee simple interest in the 635 acre parcel of real property to FmHA and Western Cotton. FmHA was earmarked to receive 515 acres of real property and Western Cotton was earmarked to receive 77 acres. Arnold and Baker was earmarked to retain ownership of 48 of the 640 acres scheduled for distribution. Arnold and Baker proposed to sell the adjoining 360 acre parcel of real property in order to pay the administrative claims, United States Trustee's fees, attorney fees, accountant fees, postpetition taxes, the real estate commission due and owing to Walter Arnold, and use the remainder to pay the unsecured creditors. Arnold and Baker retained an interest in the

1. The original sale to the Corks involved 480 acres of real property. However, the return under the settlement only involved 360 acres. Presumably, the Corks obtained a release in order to retain the 120 acres.

2. The parties agree that the original sale to Cardon involved 360 acres and that 320 acres were bought upon foreclosure. There is no explanation as to the ownership of the 40 acres which were sold to Cardon and not foreclosed upon by Arnold and Baker.

property remaining after distribution and sale.

Both FmHA and Western Cotton initially objected to confirmation of Arnold and Baker's second amended plan. However, during the course of the confirmation hearing, Western Cotton reached a settlement with Arnold and Baker pursuant to which Western Cotton agreed to accept 130 acres of real property in full satisfaction of its debt. Western subsequently withdrew its objection to confirmation and voted to accept the plan.

For purposes of the confirmation hearing, the parties stipulated that the second amended plan met all the requirements of § 1129(a)(1–13) with the exception of subsections (a)(3), (7), and (8). Additionally, FmHA objected to being crammed down pursuant to § 1129(b)(2). The principal factual issue concentrated on the fair market value of Arnold and Baker's 1320 acres of land. Arnold and Baker estimated the per acre value to be $7,322 for the 640 acre lot, $8,300 for the 360 acre lot, and $8,631 for the 320 acre lot. FmHA estimated the per acre value for the entire 1320 acres at $1,381.

On May 5, 1993, the bankruptcy court confirmed the plan finding that the property had an estimated value of $7,300 per acre. However, the bankruptcy court modified the transfer to FmHA in the plan by ordering an additional 10% transfer to FmHA in order to compensate it for the costs associated with a sale.

On May 14, 1993, FmHA timely filed its notice of appeal, and on May 17, 1993, filed a motion for stay pending appeal. The bankruptcy court denied the motion for stay by minute order on September 30, 1993. FmHA then filed an emergency motion for stay pending appeal to the Bankruptcy Appellate Panel. On October 19, 1993, the panel granted the emergency motion for a stay of the plan confirmation order pending appeal.

## STATEMENT OF THE ISSUES

Whether the bankruptcy court erred when estimating the per acre value of the real property.

Whether the second amended plan was proposed in "good faith" pursuant to § 1129(a)(3).

Whether the second amended plan satisfied the "best interests of creditors" test pursuant to § 1129(a)(7).

Whether the second amended plan treated the largest secured creditor's claim "fairly and equitably" pursuant to § 1129(b)(1).

Whether the second amended plan provided the largest secured creditor with the "indubitable equivalent" of its claim pursuant to § 1129(b)(2)(A)(iii).

## STANDARD OF REVIEW

A bankruptcy court's property valuation, the "good faith determination," and "best interests of creditors" determination are all findings of fact. *In re Tuma,* 916 F.2d 488, 491 (9th Cir.1990) (property value); *In re Corey,* 892 F.2d 829, 835 (9th Cir.1989) (good faith); *Kane v. Johns–Manville Corp.,* 843 F.2d 636, 649 (2d Cir.1988) (best interests of creditors); *In re Stolrow's Inc.,* 84 B.R. 167, 172 (9th Cir. BAP 1988) (good faith). We review findings of fact under a clearly erroneous standard. Federal Rule of Bankruptcy Procedure 8013. A finding of fact is clearly erroneous when after reviewing the evidence we are left with the definite and firm conviction that a mistake has been committed. *In re Contractors Equip. Supply Co.,* 861 F.2d 241, 243 (9th Cir.1988).

The issue of "fair and equitable" treatment pursuant to § 1129(b) is a question of fact that we review under the clearly erroneous standard. *In re Acequia, Inc.,* 787 F.2d 1352, 1358 (9th Cir.1986); *Citibank, N.A. v. Baer,* 651 F.2d 1341, 1346 (10th Cir. 1980) (Bankruptcy Act Case); *Stolrow's,* 84 B.R. at 172. Whether a plan provides a secured creditor with the "indubitable equivalent" of its claim under § 1129(b)(2)(A)(iii) is a mixed question of law and fact. *In re Pine Mountain, Ltd.,* 80 B.R. 171, 172 (9th Cir. BAP 1987). "Although the facts underlying such a determination are reviewed under the clearly erroneous standard, the question of whether the legal standard has been satisfied is reviewed de novo." *Pine Mountain,* 80 B.R. at 172.

## DISCUSSION

### A. STANDARD OF PROOF

The debtor carries the burden of proving that a Chapter 11 plan complies with the statutory requirements for confirmation under §§ 1129(a) & (b). *See, e.g., In re B.W. Alpha, Inc.*, 100 B.R. 831 (N.D.Tex.1988); *In re Rusty Jones, Inc.*, 110 B.R. 362 (Bankr. N.D.Ill.1990). Although the parties agree with the preceding conclusion, they disagree with the characterization of the scope of the debtor's burden of proof. Arnold and Baker maintain that the burden of proof is by a preponderance of the evidence while FmHA maintains that it is by clear and convincing evidence.

Proof by the preponderance of the evidence means that it is sufficient to persuade the finder of fact that the proposition is more likely true than not. *See, e.g., In re Winship,* 397 U.S. 358, 371, 90 S.Ct. 1068, 1076, 25 L.Ed.2d 368 (1970). Clear and convincing evidence is a higher standard requiring a high probability of success. *See, e.g., Colorado v. New Mexico,* 467 U.S. 310, 316, 104 S.Ct. 2433, 2437–38, 81 L.Ed.2d 247 (1984).

Some courts have applied the clear and convincing standard to plan confirmation. *See, e.g., In re Briscoe Enters., Ltd., II,* 138 B.R. 795, 804–05 (N.D.Tex.1992), *rev'd,* 994 F.2d 1160, 1163–65 (5th Cir.1993); *In re Miami Ctr. Assoc's., Ltd.*, 144 B.R. 937, 940 (Bankr.S.D.Fla.1992). Other courts have applied the preponderance of the evidence standard. *See, e.g., Aetna Realty Investors v. Monarch Beach Venture, Ltd. (In re Monarch Beach Venture, Ltd.),* 166 B.R. 428, 431–32 (C.D.Cal.1993); *In re Woodstock Assoc's I, Inc.*, 120 B.R. 436, 453 (Bankr.N.D.Ill. 1990); *Rusty Jones,* 110 B.R. at 373. One court applied the preponderance of the evidence standard to the requirements under § 1129(a) and the clear and convincing standard under the cram down provisions of § 1129(b). *In re MCorp Fin., Inc.*, 137 B.R. 219, 225 (Bankr.S.D.Tex.1992). We find the preponderance of the evidence to be the correct burden of proof in the context of plan confirmation.

The Supreme Court recently applied the preponderance of the evidence standard to nondischargeability proceedings under § 523(a). *Grogan v. Garner,* 498 U.S. 279, 285 n. 11, 111 S.Ct. 654, 658 n. 11, 112 L.Ed.2d 755 (1991). Similarly, the Tenth Circuit applied the preponderance of the evidence standard to the general discharge under § 727. *In re Serafini,* 938 F.2d 1156, 1157 (10th Cir.1991). Despite this apparent trend, the district court in *Briscoe* did not apply the *Grogan* and *Serafini* standard to plan confirmation. *Briscoe,* 138 B.R. at 804–05. The *Briscoe* court limited the holdings in those cases to the issue of dischargeability stating "[t]he clear and convincing test is the logical one to apply [in plan confirmation] because of the stricter scrutiny required when property and property rights are sought to be taken." *Briscoe,* 138 B.R. at 805 (citing *Louisville Joint Stock Land Bank v. Radford,* 295 U.S. 555, 55 S.Ct. 854, 79 L.Ed. 1593 (1935)). The Fifth Circuit reversed stating that the district court's analysis is too narrow a reading of *Grogan*:

> [B]oth § 1129 and the legislative history are silent as to the burden of proof. This case is solely about money. There are not even any quasi-liberty interests at stake. It is correct, of course, as Justice Brandeis noted during the depression in a case involving the significant alteration of farm mortgagees' rights, that the bankruptcy laws are subject to the Takings clause. The Code, however, has been the primary source of the creditors' protections not the Fifth Amendment. Congress provides protections for creditors, and in many instances allows debtors to impinge on creditor's state law rights.

*Heartland Fed. Sav. and Loan Ass'n v. Briscoe Enters., Ltd. (In re Briscoe Enters., Ltd.),* 994 F.2d 1160, 1165 (5th Cir.1993) (footnote omitted), *cert. denied,* —— U.S. ——, 114 S.Ct. 550, 126 L.Ed.2d 451 (1993) (referring to *Louisville Joint Stock Land Bank v. Radford,* 295 U.S. 555, 55 S.Ct. 854, 79 L.Ed. 1593 (1935)). The Fifth Circuit ultimately concluded that based upon legislative silence and the structure of the Code, preponderance of the evidence is the appropriate standard of proof under both § 1129(a)

and in cram down under § 1129(b). *Briscoe,* 994 F.2d at 1165. We agree.

Although the holdings in *Grogan* and *Serafini* could arguably be limited in its application to creditors, we find no sufficient justification for imposing a heightened burden of proof on the debtor in plan confirmation. Accordingly, we follow the Fifth Circuit's analysis concluding that the preponderance of the evidence is the appropriate standard of proof in confirming a plan under §§ 1129(a) & (b).

## B. PER ACRE PROPERTY VALUATION

### 1. *The Highest and Best Use of the Land*

The bankruptcy court found the highest and best use of the property was for land development. FmHA maintains that the "highest and best use" of the property is for an irrigated farm. The determination of the highest and best use of the property is a factual finding that will be upheld unless clearly erroneous. *See,* FRBP Rule 8013; *Tuma,* 916 F.2d at 491.

In the mid to late 1980s, property values in the Rainbow Valley area appreciated rapidly. The rapid appreciation was due in large part to the acquisition of thousands of acres of land by American Continental Corporation, a subsidiary of Lincoln Savings and Loan Association. However, in 1989 American filed for bankruptcy and Lincoln was taken over by the Federal Deposit Insurance Corporation. The Resolution Trust Corporation currently holds 19,000 acres that must be liquidated by December 31, 1996. *See,* 12 U.S.C. § 1441a(*o*). The rapid appreciation in property values due to the speculative development of the area transformed the "highest and best use" of the land from farm land into land held for investment. Although the RTC's substantial holdings in the Rainbow Valley area may have ultimately depreciated the market value of the property, this depreciation did not necessarily require a recharacterization of the highest and best use of the property. Accordingly, we find the bankruptcy court did not commit clear error in finding the highest and best use of the land.

### 2. *Valuation under 11 U.S.C. § 506(a)*

Arnold and Baker proposed to satisfy the FmHA claim by performing a partial "dirt for debt" transfer under the cram down provisions in § 1129(b)(2)(A)(iii). A dirt for debt transfer requires the debtor to transfer to a secured creditor the asset securing the original loan obligation. Conceivably, the transfer may be either a full transfer or a partial transfer of the collateral. *See generally, In re Sandy Ridge Dev. Corp. ("Sandy Ridge I"),* 881 F.2d 1346 (5th Cir.1989), *reh'g, en banc, denied,* 889 F.2d 663 (5th Cir.1989). When a debtor proposes a partial transfer of collateral pursuant to a plan, it is essential for the bankruptcy court to estimate the value of the "dirt" in order to determine how much of the collateral will ultimately be transferred to the creditor in satisfaction of the debt.

Section 506(a) permits a bankruptcy court to establish the value of property in a bankruptcy case. The first sentence of § 506(a) requires the bankruptcy court to bifurcate a claim into separate and independent secured claim and unsecured claim components. *In re Case,* 115 B.R. 666, 670 (9th Cir. BAP 1990). The second sentence of § 506(a) expresses the guidance provided by the Bankruptcy Code with respect to the valuation of the property subject to a lien or setoff. *See,* 3 Lawrence P. King, *Collier on Bankruptcy,* ¶ 506.04[2] at 506–25 (15th ed.1993). The second sentence of § 506(a) provides:

> Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditors interest.

11 U.S.C. § 506(a).

The legislative history from the House and Senate Reports provides guidance in formulating two general propositions for valuations under § 506(a). First, a bankruptcy court should determine value under § 506(a) on a case-by-case basis. *See,* S.Rep. No. 989, 95th Cong., 2d Sess. 68 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5854; H.R.Rep. No. 595, 95th Cong. 1st Sess. 356 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5787, 6312. The House Report provides:

"Value" does not necessarily contemplate forced sale or liquidation value of the collateral; nor does it always imply a full going concern value. Courts will have to determine value on a case-by-case basis, taking into account the facts of each case and the competing interests in the case.

H.R.Rep. No. 595, 95th Cong. 1st Sess. 356 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5787, 6312. Second, a valuation under § 506(a) should be made in light of the Code section that is relevant at the time the valuation is made. *See,* S.Rep. No. 989, 95th Cong., 2d Sess. 68 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5854; H.R.Rep. No. 595, 95th Cong. 1st Sess. 356 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5787, 6312. For example, a bankruptcy court may approach a valuation in the context of a relief from the stay hearing under § 362 differently than it would in the context of "cram down" under § 1129(b). *See, In re Sherman,* 157 B.R. 987, 991 (Bankr.E.D.Tex.1993); *Case,* 115 B.R. at 670.

The valuation in this case was performed in light of confirmation of a plan pursuant to § 1129. The Arnold and Baker plan proposed to transfer 515 acres to FmHA and 130 acres to Western Cotton in full satisfaction of their debts. The distribution was premised on an appraisal estimating the 640 acre parcel to be worth $7,322 per acre. FmHA's appraisal, on the other hand, estimated the land to be worth $1,381 per acre. Both appraisals used the market data approach to estimate the value of the land. The market data approach compares the subject property to similar properties that were recently sold in the same or general area. The comparison properties in Arnold and Baker's appraisal included 5 properties sold in 1987, 3 properties sold in 1988 and one property sold in 1989.[3] Based upon this data, Arnold and Baker estimated the property would bring $10,500 per acre in a normal market. Arnold and Baker found the market abnormal because the RTC was holding 19,000 acres for liquidation.[4] Arnold and Baker further reduced the per acre valuation to $7,322 based upon future work that needed to be performed on the land.

The bankruptcy court agreed with Arnold and Baker's appraisal finding the property to be worth $7,300 per acre. However, the bankruptcy court modified the transfer to FmHA by transferring an additional 10% to FmHA in order to compensate for the costs associated with the sale. FmHA maintains that the bankruptcy court erred by adopting Arnold and Baker's appraisal because the appraisal ignores the current market conditions by assessing the property value two years into the future and then applying a 15% discount rate to determine the present value.

The bankruptcy courts that have performed valuations in circumstances similar to the instant case have recognized essentially three valuation procedures: (1) liquidation value; (2) market value; and (3) fair value. The bankruptcy court in *In re Simons,* 113 B.R. 942 (Bankr.W.D.Tex.1990), applied a liquidation valuation where the plan proposed to return real property to a secured creditor. *Simons,* 113 B.R. at 948.

Two bankruptcy courts have applied the "market value" valuation. *In re Stockbridge*

3. FmHA determined that the highest and best use of the property was for farmland. The bankruptcy court found the highest and best use of the property to be for land investment. FmHA's appraisal only used farmland property as comparison data. Accordingly, we will not discuss the comparison properties found in the FmHA appraisal.

4. The Arnold and Baker appraisal stated:

> In my opinion, had the area not experienced some problems due to the problems of American Continental Corporation and Lincoln Savings, the subject would tend to have a per acre value of about $10,500. The problems this area has been experiencing appear to be nearing an end and therefore the area could expect to continue with its growth in the near future. The landholdings of Lincoln Savings would need to be acquired by a strong developer who would continue on with the development of Estrella.
>
> If the market were more normal, we could expect the typical marketing period, for a property such as the subject, to be approximately one year in achieving a selling price at its estimated value. In my opinion, the problems of the area have extended the marketing period approximately two years and therefore we should discount the $10,500 for two years. In my opinion, a reasonable discount rate would be 15 percent. This would indicate a value for the subject today at $7,900 per acres.

*Properties I, Ltd.,* 141 B.R. 469, 471–72 (Bankr.N.D.Ga.1992); *In re El Paso Truck Ctr., Inc.,* 129 B.R. 109, 111–12 (Bankr. W.D.Tex.1991). Market value may appropriately be defined as "[t]he most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably and assuming the price is not affected by undue stimulus." *Stockbridge,* 141 B.R. at 470 n. 1, *citing,* 12 CFR § 1608.2(f) (1994). In *Stockbridge,* the bankruptcy court first determined the fair market value of the property and then reduced that value by deducting the costs associated with maintaining and marketing the property over a three year period. *Stockbridge,* 141 B.R. at 471–72. A three year period was selected because the court determined that it would take the secured creditor at least three years to sell the property.

Valuation through the "fair value" method essentially applies a market valuation and then discounts that value to present value in order to reflect the amount of time the property is scheduled to be held by the creditor in anticipation of sale. One bankruptcy court defined "fair value" by looking to Statement # 15 of the Financial Accounting Standards Board ("FASB"):

> Fair value of assets shall be measured by their fair market value if an active market for them exists. If no active market exists for the assets transferred but exists for similar assets, the selling prices in that market may be helpful in estimating the fair value of the assets transferred. If no market price is available, a forecast of expected cash flows may aid in estimating the fair value of assets transferred, provided the expected cash flows are discounted at a rate commensurate with the risk involved.

*First American Bank v. Monica Rd. Assoc. (In re Monica Rd. Assocs.),* 147 B.R. 385, 393 (Bankr.E.D.Va.1992). The *Monica Rd.* court found the discount rate to be an important feature of the "fair value" valuation method when a current sale is not expected. *See, Monica Rd.,* 147 B.R. at 393.

The bankruptcy court in this case essentially applied a "fair value" valuation method. Arnold and Baker's appraiser determined that the property was worth $10,500 per acre. However, the appraiser found the property needed to be held for two years in order to obtain that price at sale. Arnold and Baker accounted for the holding period by applying a 15% discount rate that reduced the property's per acre valuation to $7,322. The bankruptcy court subsequently determined the property to have a value of $7,300 per acre and then reduced that value by 10% to reflect the eventual costs associated with selling the property. FmHA was ultimately scheduled to receive 566.5 acres in satisfaction of its debt.

The "fair value" method of valuation is an acceptable valuation procedure. The method balances the interests of the debtor, by avoiding a liquidation valuation when there is no current market for the property, with the interests of a creditor, by realizing a present value for the property when the experts agree that the property is not marketable until two or three years into the future. *See,* H.R.Rep. No. 595, 95th Cong. 1st Sess. 356 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5787, 6312 ("'Value' does not necessarily contemplate forced sale or liquidation value of the collateral; nor does it always imply a full going concern value."). A discount rate is appropriate because it attempts to value the collateral as though it were in the hands of the creditor. *See, In re Mitchell,* 954 F.2d 557, 559 (9th Cir.1992), *cert. denied,* — U.S. —, 113 S.Ct. 303, 121 L.Ed.2d 226 (1992) [5]; *see also, Monica Rd.,* 147 B.R. at 392.

Although we are troubled by the fact that the accepted appraisal ignored the effect on the market of the 19,000 acres held by the RTC, we nevertheless find that the bankruptcy court valued the property in light of

5. In *Mitchell,* the court found the value of an automobile under § 506(a) is measured by its wholesale value. *Mitchell,* 954 F.2d at 560. The *Mitchell* court looked to the language in § 506(a) requiring the valuation to be made "in light of the disposition or use of such property" and ultimately determined that the property should be valued as though it were in the hands of the creditor. *See, Mitchell,* 954 F.2d at 560.

the purpose of the valuation and the disposition of the property under the terms of the plan. *See,* 11 U.S.C. § 506(a). Furthermore, FmHA has not met its burden of proof establishing that the bankruptcy court's determination was clearly erroneous. FmHA provided a very incomplete transcript from the valuation hearings and FmHA's attorney admitted at oral argument that the bankruptcy court's determination was not clearly erroneous.

## C. PLAN CONFIRMATION

For purposes of the confirmation hearing, the parties stipulated that the seconded amended plan met all the requirements of § 1129(a)(1–13) with the exception of subsections (a)(3), (7), and (8). Additionally, FmHA objected to being crammed down under § 1129(b). FmHA maintains that the bankruptcy court erred in confirming the plan because the plan was not proposed in good faith, did not satisfy the best interests of creditors test, and did not satisfy the fair and equitable requirements.

### 1. *Good Faith*

Section 1129(a)(3) states that the bankruptcy court shall confirm a plan if the plan has been proposed in good faith and not by any means forbidden by law. The good faith that is required to confirm a plan requires the plan to achieve a result consistent with the objectives and purposes of the Bankruptcy Code. *In re Mann Farms Inc.,* 917 F.2d 1210, 1214 (9th Cir.1990); *In re Corey,* 892 F.2d 829, 835 (9th Cir.1989), *cert. denied,* 498 U.S. 815, 111 S.Ct. 56, 112 L.Ed.2d 31 (1990); *Pacific First Bank ex rel. RT Capital Corp. v. Boulders on the River (In re Boulders on the River),* 164 B.R. 99, 103 (9th Cir. BAP 1994). The bankruptcy court found that Arnold and Baker's plan was proposed in good faith. Although ultimately some aspects of the plan may not comply with the Bankruptcy Code, the bankruptcy court's finding that the plan was proposed in good faith was not clearly erroneous. There was a reasonable likelihood that Arnold and Baker's plan complied with the objectives and purposes of the Bankruptcy Code. *See, In re Elm Creek Joint Venture,* 93 B.R. 105, 109 (Bankr.W.D.Tex.1988).

### 2. *Best Interests of Creditors Test*

FmHA maintains the plan did not contain a liquidation analysis pursuant to § 1129(a)(7), and therefore is not confirmable. Section 1129(a)(7) incorporates the former "best interests of creditors" test as found in the Bankruptcy Act. *See, In re M. Long Arabians,* 103 B.R. 211, 217 (9th Cir. BAP 1989). Section 1129(a)(7) provides:

> (a) The court shall confirm a plan only if all of the following requirements are met:
>
> ....
>
> (7) With respect to each impaired class of claims or interests—
>
> (A) each holder of a claim or interest of such class—
>
> (i) has accepted the plan; or
>
> (ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under Chapter 7 of this title on such date; ....

11 U.S.C. § 1129(a)(7).

Arnold and Baker maintain that this issue is not reviewable because FmHA raises this argument for the first time on appeal. It is a general rule that appellate courts will not consider arguments raised for the first time on appeal. *Abex Corp. v. Ski's Enter., Inc.,* 748 F.2d 513, 516 (9th Cir.1984). The application of this rule is discretionary. *Singleton v. Wulff,* 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976); *Abex,* 748 F.2d at 516. "It is well settled in this circuit that where the new issue is purely a legal one, the injection of which would not have caused the parties to develop new or different facts, we may resolve it on appeal." *Abex,* 748 F.2d at 516 (quoting *United States v. Dann,* 706 F.2d 919, 925 n. 5 (9th Cir.1983), *cert. granted,* 467 U.S. 1214, 104 S.Ct. 2693, 81 L.Ed.2d 362 (1984)).

Section 1129(a) states that the court shall confirm a plan only if all of the requirements are met. *See, In re Bonner Mall Partner-*

*ship,* 2 F.3d 899, 905 (9th Cir.1993), *cert. granted,* — U.S. —, 114 S.Ct. 681, 126 L.Ed.2d 648 (1994) (stating that all thirteen requirements for confirmation under § 1129(a) must generally be satisfied). Accordingly, we will review this question on appeal.

Arnold and Baker maintain that a liquidation analysis is not necessary because the plan paid FmHA's claim in full and therefore FmHA cannot receive less then it would in a Chapter 7 distribution. We agree. FmHA's original valuation, which was essentially a liquidation valuation, estimated the per acre value for the entire 1320 acres at $1,381 per acre. The Arnold and Baker plan, on the other hand, proposed to distribute land to FmHA assessed at $7,300 per acre. Although Arnold and Baker should have included a liquidation analysis in the plan and disclosure statement, the evidence establishes that FmHA will receive at least as much as it would have in a Chapter 7. *See, Elm Creek Joint Venture,* 93 B.R. at 109.

3. *Cram Down*

When proposing a plan, the debtor places the administrative claimants, the creditors, and the equity holders into classes based upon the similarity of their claims or interests. *See,* 11 U.S.C. § 1122. A bankruptcy court shall confirm the plan "if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." *See,* 11 U.S.C. § 1129(b)(1); *Bonner Mall,* 2 F.3d at 906. This form of plan confirmation is colloquially referred to as "cram down." *Bonner Mall,* 2 F.3d at 906. FmHA does not argue that Arnold and Baker's plan discriminates unfairly.[6] As a result, our discussion will focus on the "fair and equitable" standard.

Section 1129(b)(2)(A) identifies three explicit requirements of the fair and equitable standard with respect to a secured class. Section 1129(b)(2)(A) provides:

> (2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:
>
> (A) With respect to a class of secured claims, the plan provides—
>
> (i)(I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and
>
> (II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;
>
> (ii) for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or
>
> (iii) for the realization by such holders of the indubitable equivalent of such claims.

11 U.S.C. § 1129(b)(2)(A)(i)–(iii).

4. *Providing the Indubitable Equivalent of the Secured Claim*

The plan approved by the bankruptcy court proposed to transfer 566.5 acres to FmHA in full satisfaction of its liens. This type of transaction is colloquially referred to as a "dirt for debt" distribution. Arnold and Baker maintain the plan provided FmHA with the indubitable equivalent of its secured claim by transferring a portion of Arnold and Baker's real property. FmHA maintains

6. Although we do not take this opportunity to discuss unfair discrimination, there is evidence that Arnold and Baker may have discriminated unfairly when it settled with Western Cotton. Western Cotton was owed $565,044 and FmHA was owed $3,837,618. The plan proposed to distribute 77 acres to Western Cotton and 515 acres to FmHA @ $7,322 per acre in full satisfaction of their debts. Both FmHA and Western Cotton objected to confirmation. Arnold and Baker ultimately settled with Western Cotton by increasing their distribution to 130 acres. As a result, Western Cotton received $951,860 in land for a debt valued at $565,044.

that it did not receive the indubitable equivalent of its claim because the partial distribution transferred the risk of sale to FmHA. In other words, if FmHA subsequently sells the property for less than the bankruptcy court's valuation, FmHA has no recourse for the deficiency because FmHA does not retain a security interest in the property retained by Arnold and Baker.

We must first decide whether a partial transfer of a secured creditor's collateral in satisfaction of its entire secured claim may be the indubitable equivalent of the original secured claim pursuant to § 1129(b)(2)(A)(iii). If we answer this question in the affirmative, we must then decide under what circumstances such a partial transfer will provide the indubitable equivalence.

The Fifth Circuit's opinion in Sandy Ridge I is regarded by many bankruptcy courts as the seminal case with respect to "dirt for debt" distributions. *See, e.g., In re Pennave Properties Assoc.,* 165 B.R. 793, 795 (E.D.Pa. 1994); *In re Wermelskirchen,* 163 B.R. 793, 797 (Bankr.N.D.Ohio 1994); *In re Martindale,* 125 B.R. 32, 38 n. 5 (Bankr.D.Idaho 1991); *In re Simons,* 113 B.R. at 946–47. The *Sandy Ridge I* court held:

> [T]he transfer on plan approval of all its collateral to a secured creditor, at a value properly fixed by the bankruptcy court, gives that creditor the indubitable equivalent of its secured claim.

*Sandy Ridge (Sandy Ridge I),* 881 F.2d at 1354. FmHA maintains that Sandy Ridge I is distinguishable from the facts in this case. We agree.

First, when denying the petition for rehearing, the *Sandy Ridge II* court limited the scope of its prior opinion and therefore its persuasive influence. *See, In re Sandy Ridge Devel. Corp. ("Sandy Ridge II"),* 889 F.2d 663 (5th Cir.1989); *Martindale,* 125 B.R. at 38 n. 5 (limiting *Sandy Ridge I* to its facts). The *Sandy Ridge II* court stated:

> In denying the petition for rehearing ... we have held that distribution of estate property ... is not *per se* categorically prohibited as a matter of law under Chapter 11 of the Bankruptcy Code and the plan in question meets the requirements of 11 U.S.C. § 1129(b)(2)(A)(iii).... However, *these holdings do not mean, and we have not held, that the plan in question meets (or fails to meet) the "fair and equitable" requirement (or the "does not discriminate unfairly" requirement) of section 1129(b)(1).... These matters are among those to be addressed by the bankruptcy court on remand.*

*Sandy Ridge (Sandy Ridge II),* 889 F.2d at 663–64 (emphasis added).

Second, *Sandy Ridge I* permitted the transfer of all of the secured creditor's collateral. The secured creditor in *Sandy Ridge I* was undersecured. The bankruptcy court determined the secured claim and the debtor proposed to give all of the secured collateral to the creditor in satisfaction of its secured lien. *Sandy Ridge (Sandy Ridge I),* 881 F.2d at 1354. The creditor was then able to pursue the guarantors for the remaining unsecured claim. The Arnold and Baker plan, on the other hand, does not propose to transfer all 1320 acres of FmHA's collateral in satisfaction of the entire claim, but rather 566.5 acres or approximately 43% of FmHA's collateral.

It is apparent that a secured creditor who receives *all* of its collateral in satisfaction of its claim has received the indubitable equivalence of its secured claim. *See,* 124 Cong. Rec. H11104 (daily ed. Sept. 28, 1978) (statement of Rep. Edwards) (abandonment of the collateral to the creditor would clearly satisfy indubitable equivalence).

However, where the creditor is earmarked to receive *part* of its collateral, it will be a rare case in which the creditor will have received the indubitable equivalent of its claim. Any such plan will be subject to extremely close scrutiny to insure that the creditor will actually receive the indubitable equivalent of its secured claim.

The legislative history to § 1129(b)(2)(A)(iii) clearly indicates that Congress intended the phrase "indubitable equivalent" to take on the meaning given it by Judge Learned Hand in *In re Murel Holding Corp.,* 75 F.2d 941, 942 (2d Cir.1935). *See,* H.R.Rep. No. 595, 95th Cong. 1st Sess. 414–

415, *reprinted in* 1978 U.S.C.C.A.N. 5787, 6370–6371; S.Rep. No. 989, 95th Cong., 2d Sess. 127, *reprinted in* 1978 U.S.C.C.A.N. 5787, 5913. Judge Hand, in *Murel*, explained the concept of adequate protection as follows:

> It is plain that "adequate protection" must be completely compensatory; and that payment ten years hence is not generally the equivalent of payment now. Interest is indeed the common measure of the difference, but a creditor who fears the safety of his principal will scarcely be content with that; he wishes to get his money or at least the property. We see no reason to suppose that the statute was intended to deprive him of that in the interest of junior holders, unless by a substitute of the most indubitable equivalence.

*Murel*, 75 F.2d at 942. The Supreme Court analyzed the meaning of "indubitable equivalence" finding that "*Murel* used the words 'indubitable equivalence' with specific reference not to interest (which was assured), but to the *jeopardized principal of the loan.*" *United Sav. Ass'n v. Timbers of Inwood Forest, Ltd.*, 484 U.S. 365, 378, 108 S.Ct. 626, 634, 98 L.Ed.2d 740 (1988) (emphasis added). Similarly, the Ninth Circuit interpreted "indubitable equivalence" in *Murel* to mean a substitute that "must both compensate for present value and *insure the safety of the principal.*" *In re American Mariner Indus., Inc.*, 734 F.2d 426, 433–34 (9th Cir.1984), *abrogated on other grounds, United Sav. Ass'n v. Timbers of Inwood Forest,* 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988) (emphasis added).

The finding of a trial court of a particular value of real property for the purpose of § 506 will not necessarily determine whether the creditor will receive the indubitable equivalent of its secured claim. Experience has taught us that determining the value of real property at any given time is not an exact science. Because each parcel of real property is unique, the precise value of land is difficult, if not impossible, to determine until it is actually sold. Nevertheless, bankruptcy courts have traditionally been requested, out of necessity, to determine the value of various types of property, including real property, and yet courts have recognized the difficulty of being able to determine accurately the value of land. For instance, in *In re Walat Farms, Inc.*, 70 B.R. 330 (Bankr. E.D.Mich.1987), the court stated:

> Similarly, we concede to doubts about our ability to fix the "value" of the land in question. We need not make a pronouncement that no plan proposing the surrender of a portion of mortgaged land to a mortgagee in return for a compelled release of the lien on the remainder of the property will ever be confirmed. Suffice it to say, however, that no matter how hot the market for real estate may become in the future, the market for farm real estate here and now is not such which would permit us to hold that the value of the land being offered is the indubitable equivalent of Equitable's claim. "Indubitable" means "too evident to be doubted." *Webster's Ninth New Collegiate Dictionary* (1985). We profess doubt on the facts of this case.

*Walat Farms,* 70 B.R. at 334 (footnote omitted).

> Similarly, in *Martindale* the court noted: Put another way, the preponderance of the evidence in the form of the appraisers' testimony may demonstrate a property value at a certain dollar amount. However, because of the imprecision inherent in this kind of proof, the dollar value shown may not necessarily constitute the indubitable equivalent of a cash payment to the creditor in a like amount. *See, e.g.,* [*In re* ] *Sandy Ridge,* [*Development Corp.*], 77 B.R. [69] at 73 [ (Bankr.M.D.La.1987) ] ("If reasonable people can differ on the valuation of property, the valuation might be proved by a preponderance of the evidence but the conclusion would not be 'indubitable.' ").

*Martindale,* 125 B.R. at 39.

Thus, the determination of whether a dirt for debt distribution provides a secured creditor with the indubitable equivalent of its secured claim must be made on a case-by-case basis, and we must decide whether the bankruptcy court's finding with respect to the value of the real property for the purpose of determining the amount of the creditor's secured claim provided the secured

creditor with the indubitable equivalent of its claim. In addition, we conclude that in order for a partial distribution to constitute the most "indubitable equivalence," the partial distribution must insure the safety of or prevent jeopardy to the principal.

Although we conclude that the bankruptcy court's valuation in this case is not clearly erroneous, we are not convinced that its finding regarding the value of the real property provided the indubitable equivalence of the particular secured claim in question, nor are we convinced that the partial distribution of 566.5 acres to FmHA will insure the safety of or prevent jeopardy to the principal. *See, In re Pine Mountain, Ltd.,* 80 B.R. 171, 172 (9th Cir. BAP 1987) (facts underlying the "indubitable equivalence" determination are reviewed under the clearly erroneous standard; however, the question of whether the legal standard has been satisfied is reviewed independently).

The evidence at trial demonstrated that the value of the real property was far from certain. The Arnold and Baker appraisal admitted that due to unfavorable market conditions, including the fact that the RTC was holding 19,000 acres in the same area for liquidation, the normal one year marketing period for the property would be extended by another two years.

The bankruptcy court agreed with Arnold and Baker's valuation of $7,300 per acre. FmHA, however, proffered a valuation of $1,381 per acre. The large disparity in the parties' valuation of the same property illustrates the obvious uncertainty in attempting to forecast the price at which real property will sell at some uncertain future date.

The bankruptcy court found the value of each acre to be $7,300, and thus the value of the 566.5 acres to be transferred to FmHA to be $4,135,450 ($7,300 × 566.5). We must decide, therefore, whether a distribution of land with an estimated value of $4,135,450 constitutes the indubitable equivalent of a $3,837,618 claim secured by 1,320 acres. Under the circumstances of this case, we conclude that it does not.

The partial distribution of 566.5 acres to FmHA will not insure the safety of or prevent jeopardy to the principal. FmHA originally lent funds to Arnold and Baker secured by 1320 acres of land. If Arnold and Baker defaulted on the terms of the note, FmHA bargained for the right to foreclose on the entire 1320 acres of land in order to satisfy the outstanding obligation. In this situation, the principal is protected to the extent of the entire 1320 acres held as security. However, when there is a partial distribution of the collateral to a secured creditor in satisfaction of its secured claim, the substitute does not insure the safety of or prevent jeopardy to the principal.

If FmHA subsequently sells the property for less than the value calculated by the bankruptcy court, FmHA has no recourse to the remaining collateral to satisfy the deficiency. As a result, the distribution to FmHA may not be "completely compensatory." *See, Murel Holding,* 75 F.2d at 942. FmHA is forced to assume the risk of receiving less on the sale without being able to look to the remaining undistributed collateral for security. "To the extent a debtor seeks to alter the collateral securing a creditor's loan, providing the 'indubitable equivalent' requires that the substitute collateral not increase the creditor's risk exposure." *In re Keller,* 157 B.R. 680, 683–84 (Bankr. E.D.Wash.1993); *see also, Monarch Beach,* 166 B.R. at 436 (fair and equitable prohibits a plan from unfairly shifting risk of plan failure to the creditor).

The determination of whether a partial dirt for debt distribution will provide the creditor with the indubitable equivalence of its secured claim must be made on a case-by-case basis. Such a determination must be subject to extremely close scrutiny. For instance, such a case may exist where the parties generally agree upon the value of the land but for some reason an immediate sale of the property is not practical. In such a situation, the secured creditor's rights may be fully protected by the payment of appropriate interest payments for a reasonable period of time. The real issue in such a case is not indubitable equivalency but rather feasibility.

For example, in *In re Fursman Ranch,* 38 B.R. 907 (Bankr.W.D.Mo.1984), the plan provided for a portion of the property in which

the creditor held a security interest to be conveyed to the creditor, while the debtor retained the remainder of the real property to be paid for under the plan in cash payments, subject to the lien of the secured creditor. The court noted that indubitable equivalency was not really the question but, rather, that the issue was feasibility. "Here the creditors concede that the value of the assets exceed the claims against them. The real issue to creditors is feasibility." *Fursman Ranch,* 38 B.R. at 909. The court further found that the plan also provided additional protection for the secured creditor. "There is an additional safeguard here because this is an ongoing case. If a commercially reasonable sale by the creditors does not result in payment approximating the values set here, the creditors may ask for reconsideration of their claims." *Fursman Ranch,* 38 B.R. at 910.

## CONCLUSION

We hold that the Arnold and Baker plan, which proposes to transfer 566.5 acres or 43% of FmHA's collateral to FmHA in full satisfaction of its secured claim, does not provide FmHA with the indubitable equivalent of its secured claim. Accordingly, we reverse the bankruptcy court's order confirming the plan.